[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 94-4931

_____

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
2/17/03
THOMAS K. KAHN
CLERK

D. C. Docket No. 92-8225-CV-JWK

JAMES E. TAYLOR,

Petitioner-Appellant,

versus

HARRY K. SINGLETARY, Secretary,
Florida Department of Corrections,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(August 5, 1998)

Before TJOFLAT and EDMONDSON, Circuit Judges, and O'NEILL*, Senior District Judge.

_____

* Honorable Thomas N. O'Neill, Jr., Senior U.S. District Judge for the Eastern District of Pennsylvania, sitting by designation.

TJOFLAT, Circuit Judge:

On June 25, 1986, petitioner was convicted in the Circuit Court of Indian County, Florida for conspiring to traffic in cocaine, trafficking in marijuana, and violating the Florida Racketeer Influenced and Corrupt Organizations Act. The court sentenced him to a total of seventy years incarceration for these offenses. After exhausting his state remedies, petitioner applied to federal district court for a writ of habeas corpus setting aside his convictions. He contended that the circuit court denied him due process of law when it allowed the prosecutor to impeach him with testimony that petitioner gave pursuant to an informal immunity agreement at a federal drug-smuggling trial a few years earlier.[1] The district court denied relief; we affirm.

I.

Before he was convicted in the Indian River circuit court, petitioner James Taylor made his living by providing aircraft for drug smugglers. As a result of his activities in the 1970's, he attracted the attention of, and became an informant for, the FBI. In 1981, FBI agents asked Taylor to testify before a Southern District of Florida grand jury about two particular smuggling organizations. Taylor informed the agents that if subpoenaed to appear before the grand jury, he would invoke his Fifth Amendment privilege against self-incrimination. In response, the agents told Taylor that they would seek a statutory grant of immunity to force Taylor to testify, and suggested that he find a lawyer to help him negotiate an immunity agreement.

---

[1] Petitioner also contended that prosecutorial misconduct rendered his trial fundamentally unfair in violation of his right to due process of law. The district court rejected this claim as meritless, as do we.

Taylor, represented by counsel, subsequently entered into immunity negotiations with the United States Attorney's Office for the Southern District of Florida and signed an informal immunity agreement with the United States Attorney. The agreement states, in part:

> [T]he United States Attorney for the Southern District of Florida agrees not to prosecute James Taylor for his heretofore disclosed participation, if any, in criminal activity involving the importation, possession and distribution of controlled substances in the Southern District of Florida during the period of June 1, 1977 through December 31, 1980. Furthermore, no information so disclosed by James Taylor during the course of his co-operation will be used against him.

In return, Taylor was to cooperate with the grand jury's investigation and to testify at trial if necessary.[2]

---

[2] The entire agreement was set out in a letter to Taylor's attorney, Phillip Butler, dated November 17, 1981. It reads as follows:

Dear Mr. Butler:

This letter is being written to confirm the agreement entered into between this office and your client, James Taylor.

It is agreed, in exchange for the promises set forth below, that your client will co-operate fully with this office, agents of the Federal Bureau of Investigation, and other law enforcement agencies as this office may require. This co-operation will include the following:

1.   James Taylor agrees to be fully debriefed concerning his knowledge of, and participation in, activities involving the importation, possession and distribution of narcotics in the Southern District of Florida by Donald Raulerson and others. This debriefing will be conducted by this office, agents of the Federal Bureau of Investigation, and other law enforcement agencies, as this office may require. . . . All information provided by James Taylor shall be truthful, complete and accurate; and
2.   James Taylor agrees to testify as a witness before a Grand Jury in this district or elsewhere as may be requested, and at any resulting trials, either in this district or elsewhere, as this office may require, at the trial or trials of Donald Raulerson and his associates.

[illegible] the co-operation of James Taylor, as set out above, the United States Attorney for the Southern District of Florida agrees not to prosecute James Taylor for his heretofore

3

Although the immunity agreement states: "This agreement is limited to the United States Attorney's Office for the Southern District of Florida and cannot bind other federal, state of [sic] local prosecuting authorities," Taylor claims that he asked Samuel Smargon, the Assistant United States Attorney who negotiated the agreement with Taylor's attorney, about his potential exposure to state prosecution, and that Smargon orally assured him that Florida authorities would

---

disclosed participation, if any, in criminal activity involving the importation, possession and distribution of controlled substances in the Southern District of Florida during the period of June 1, 1977 through December 31, 1980. Furthermore, no information so disclosed by James Taylor during the course of his co-operation will be used against him.

This agreement is limited to the United States Attorney's Office for the Southern District of Florida and cannot bind other federal, state of [sic] local prosecuting authorities.

It is further understood that James Taylor must at all times give, complete, truthful and accurate information and testimony. Should it be judged by this office that James Taylor has intentionally given false, misleading or incomplete information or testimony or has otherwise violated any provision of this agreement, this agreement may be deemed null and void by this office and James Taylor shall therefore be subject to prosecution for any federal criminal violation of which this office has knowledge, including but not limited to perjury and obstruction of justice. Any such prosecution may be premised upon any information provided by James Taylor during the course of his co-operation and such information may be used against him.

No additional promises, agreements and conditions have been entered into other than those set forth in this letter and none will be entered into unless in writing and signed by all parties.

If the foregoing accurately reflects the agreement entered into between this office and your client, James Taylor, it is requested that James Taylor and yourself execute this letter as provided below.

Very truly yours,

ATLEE W. WAMPLER, III
UNITED STATES ATTORNEY

/s/
SAMUEL J. SMARGON
Assistant United States Attorney
Major Narcotics Traffickers Section

4

not use any of Taylor's testimony under the agreement against him. Taylor's testimony is the only evidence of this alleged "side deal."

Pursuant to the immunity agreement, Taylor testified before the grand jury, implicating his drug-smuggling associates. He also testified in a criminal case that grew out of the grand jury investigation, the "Bancoshares" case. Taylor did not invoke his Fifth Amendment privilege against self-incrimination before the grand jury or at the Bancoshares trial.

On January 15, 1986, the State Attorney for Indian River County filed a three-count information charging Taylor with conspiracy to traffic cocaine and the distribution of marijuana in violation of Florida law. On March 10, Taylor moved the Indian River circuit court to dismiss the information on the ground that it was based on evidence disclosed by him pursuant to his informal immunity agreement with the United States Attorney for the Southern District of Florida. Alternatively, he moved the court to conduct a hearing to determine whether the State Attorney had based the information on such evidence. Taylor cited Kastigar v. United States, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), as support for his motion. See id. at 460, 92 S.Ct. at 1665 (stating that a government entity seeking to prosecute a witness who has been immunized under the federal immunity statute, 18 U.S.C. §§6001-6003 (1994), has "the affirmative duty to prove that the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony").

The court noted, however, that Kastigar concerned a witness who had been granted immunity under the federal immunity statute, 18 U.S.C. §§ 6001-6003 (1994), while Taylor was claiming immunity under an informal or "pocket" immunity agreement. It therefore held a "pre-Kastigar hearing to determine whether Taylor was even entitled to Kastigar's protections. At the

5

close of the hearing, the court cited <u>United States v. Barker</u>, 542 F.2d 479 (8th Cir. 1978), in which the Eighth Circuit assumed without deciding that an informally-immunized defendant enjoys the same "Fifth Amendment protections" as does a statutorily-immunized defendant. The circuit court then reasoned that, because the rights provided under <u>Kastigar</u> also stemmed from the Fifth Amendment, an informally-immunized defendant must enjoy the same <u>Kastigar</u> protections as does a statutorily-immunized defendant. It concluded that "the Federal authorities did compel Defendant's testimony" by entering into an informal immunity agreement with Taylor, and that Taylor was entitled to a <u>Kastigar</u> hearing to determine whether the State Attorney had violated Taylor's constitutional rights by bringing an information based on the testimony given pursuant to that agreement.

The circuit court then held a full <u>Kastigar</u> hearing. After hearing testimony from both sides, the court ruled that the State Attorney was basing his prosecution solely on information gleaned from sources independent of Taylor's Bancoshares testimony. It therefore denied Taylor's motion to dismiss his indictment and proceeded to trial.

At trial, Taylor took the stand in his own defense. He did not assert his Fifth Amendment privilege at any time during his direct examination. On cross-examination, the prosecutor attempted to impeach Taylor with his Bancoshares testimony. Taylor's attorney immediately objected, arguing that because the court had ruled that <u>Kastigar</u> applied in Taylor's case, it could not allow the Bancoshares testimony to be used against Taylor in any way, including for impeachment. The court overruled the objection and allowed the prosecutor to use Taylor's Bancoshares testimony to attack his credibility. Taylor was convicted on all three counts of the information and sentenced accordingly.

6

Following the entry of judgment, Taylor appealed his convictions to the Florida District Court of Appeal, arguing, <u>inter alia</u>, that the trial court erred in allowing the state to cross-examine him using his Bancoshares testimony. The district court of appeal affirmed the trial court's judgment without comment. <u>Taylor v. State</u>, 514 So.2d 367 (1987) (table).

After exhausting his state remedies, Taylor filed the instant petition for a writ of habeas corpus.[3] The district court denied Taylor's petition, but on different grounds from those on which the state circuit court had relied. The district court concluded that the circuit court's emphasis on <u>Barker</u> was misplaced, and that subsequent decisions had clarified that a defendant who voluntarily enters into an informal immunity agreement is only protected to the extent established in the agreement itself. The district court thus looked to Taylor's agreement to determine the extent of Taylor's immunity from the use of his statements to impeach him in state court. Finding that by its plain terms the agreement did not bind state prosecutors or state courts, the district court rejected Taylor's petition.

Taylor now appeals, presenting two grounds for setting aside his conviction. First, Taylor claims that because he testified at the Bancoshares trial in exchange for the promise of governmental benefits, his testimony was per se "involuntary"and is thus inadmissible against him under the Due Process Clause of the Fourteenth Amendment. Second, Taylor claims that he was entitled to use immunity in state court under the terms of his informal immunity agreement with the United States Attorney, and that the circuit court therefore denied him due

---

[3] This is Taylor's second habeas petition. The district court dismissed the first for lack of exhaustion. Taylor subsequently exhausted his state court remedies.

7

process by failing to enforce the agreement.  Because we find neither of Taylor's arguments convincing, we affirm the district court's denial of habeas corpus relief.

## II.

### A.

Taylor first argues that his Bancoshares testimony was "involuntary" and thus inadmissible against him at his state trial.  See Mincey v. Arizona, 437 U.S. 385, 398, 98 S.Ct. 2408, 2416, 57 L.Ed.2d 290 (1978) (holding that a defendant's involuntary statements could not be used to impeach his credibility at trial because "any criminal trial use against a defendant of his involuntary statement is a denial of due process of law").  He asks us to hold that testimony, such as his Bancoshares testimony, that is given in exchange for a governmental promise of immunity is per se involuntary.  As we explain in part II.A.1, we decline to do so.  A voluntarily-entered informal immunity agreement does not, by virtue of its existence, override a witness' free will such that the witness' testimony is involuntary under the Due Process Clause.  See Shotwell Mfg. Co. v. United States, 371 U.S. 341, 348, 83 S.Ct. 448, 453, 9 L.Ed.2d 357 (1962) ("A coerced confession claim, whether founded on a promise of immunity or otherwise, always involves this question: did the governmental conduct complained of 'bring about' a confession 'not freely self-determined'?" (citation omitted)).  Because we find in part II.A.2 that Taylor's testimony is not otherwise involuntary, his first argument fails.

### 1.

We determine whether a defendant's statement is "involuntary" under a "totality of the circumstances" test, United States v. Washington, 431 U.S. 181, 188, 97 S.Ct. 1814, 1818, 52 L.Ed.2d 238 (1977), which is based on findings of fact.  See generally Rogers v. Richmond, 365 U.S. 534, 544-48, 81 S.Ct. 735, 741-43, 5 L.Ed.2d 760 (1961).  Taylor, however, urges us to adopt a per se rule under which testimony given in exchange for a governmental promise of immunity is involuntary, regardless of the surrounding circumstances.  We find no support for such a rule; in fact, we believe that the Supreme Court has already spoken against it.

In Bordenkircher v. Hayes, 434 U.S. 357, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978), the Court specifically rejected a per se involuntariness rule in a plea bargain context.  The petitioner in Bordenkircher contended that the prosecutor threatened to indict him under a repeat offender statute if he did not plead guilty to a lesser offense, and then carried out the threat.  The petitioner claimed that by behaving this way, the prosecutor had "punished" him for exercising his right to demand a trial, and that he had therefore been denied his right to due process of law. The Supreme Court, however, rejected the petitioner's claim, holding that the prosecutor had "no more than openly presented the defendant with the unpleasant alternatives of forgoing trial or facing charges on which he was plainly subject to prosecution . . . ."  Id. at 365, 98 S.Ct. at 669. The Court emphasized that the prosecutor's promise of leniency would not have rendered a plea given in exchange for that promise involuntary, see id. at 363, 98 S.Ct. at 668 ("[A]cceptance of the basic legitimacy of plea bargaining necessarily implies rejection of any notion that a guilty plea is involuntary in a constitutional sense simply because it is the end result of the bargaining process."), and specifically rejected a "rigid rule" that would preclude a prosecutor from using

9

the promise of governmental benefits to "induce a guilty plea." See id. at 364-65, 98 S.Ct. at 669.

We believe that Bordenkircher applies equally to an agreement under which a defendant agrees to waive his right to trial and all attendant rights by pleading guilty (the classic plea bargain), and to an agreement, such as Taylor's informal immunity agreement, under which a potential defendant agrees to waive his right against self-incrimination by not invoking his Fifth Amendment privilege. In both contexts – the plea bargain and the immunity agreement – the defendant or potential defendant seeks benefits he is otherwise unentitled to under the law; in return, he promises to forgo something to which he is entitled. These are "give-and-take" situations akin to a contractual negotiation, in which the parties are negotiating at arms-length. See Parker v. North Carolina, 397 U.S. 790, 809, 90 S.Ct. 1474, 1479, 25 L.Ed. 2d 785 (1970) (Brennan, J., dissenting) (characterizing a plea bargain as a "give-and-take negotiation . . . between the prosecution and defense, which arguably possess relatively equal bargaining power").[4] They are not the type of situations in which the danger that the defendant's "will [will be] overborne," Rogers, 365 U.S. at 544, 81 S.Ct. at 741, is so great that a per se rule is necessary to prevent the possibility. Thus, we conclude that Bordenkircher precludes a per se involuntariness rule for informal immunity agreements as well as for plea bargains. Cf. United States v. Trammel, 445 U.S. 40, 53, 100 S.Ct. 906, 914, 63 L.Ed.2d 186 (1980) (holding without discussion that fact that witness spouse testified against defendant "after a grant of immunity and

---

[4] We assume in this discussion that the defendant or potential defendant is represented by competent counsel.

10

assurances of lenient treatment does not render [spouse's] testimony involuntary," and citing

Bordenkircher).

Moreover, we believe the case Taylor cites as support for his proposed per se rule, Bram

v. United States, 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897), is inapposite.  The Bram

Court stated in dicta that "a confession, in order to be admissible, must be free and voluntary:

that is, must not be extracted by any sort of threats or violence, nor obtained by any direct or

implied promises, however slight . . . ."  Taylor argues that the Court's use of the words

"however slight" is evidence that governmental promises in the immunity context render

consequential statements involuntary, no matter what the surrounding circumstances.  See also

Shotwell, 371 U.S. at 348, 83 S.Ct. at 453-54 (stating in dicta that "[p]etitioners' position is not

like that of a person . . . to whom a policeman, a prosecutor, or an investigating agency has made

a promise of immunity or leniency in return for a statement.  In those circumstances an

inculpatory statement would be the product of inducement, and thus not an act of free will").

When we examine the facts of Bram, however, it becomes clear that Taylor is incorrect.

In Bram, the defendant – the first mate of a merchant vessel who was suspected of

murdering the ship's second mate, the captain, and the captain's wife – was brought ashore in

irons, detained, and strip-searched.  See Bram, 168 U.S. at 561-62, 18 S.Ct. at 194.  During or

after the strip-search, a detective spoke with Bram, and informed him that another member of the

crew had accused him of the murders.  Id. at 562, 18 S.Ct. at 194.  Bram then gave statements to

the detective.  On these facts, the Bram Court found that Bram's statements were inadmissible

against him at trial, and therefore set aside his conviction on direct appeal.  It is clear, however,

that what the Court was concerned with was not merely the possible implication of a promise of

governmental benefits, but Bram's overall position with respect to the detective obtaining his statements. See Bram, 168 U.S. at 562, 18 S.Ct. at 194 (stating that "the situation of the accused, and the nature of the communication . . . necessarily overthrows any possible implication that his reply . . . could have been the result of a purely voluntary mental action"). Although full recognition of the coercive power of an interrogation situation would not come until seventy years later, in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Bram Court was addressing the same problem addressed in Miranda – how to guard against the inherently coercive atmosphere of a police interrogation and its effect on an accused's exercise of his constitutional rights. Consequently, regardless of whether Bram provides support for a per se rule in an interrogation situation, see United States v. Ferrara, 377 F.2d 16, 17 (2d Cir. 1967) (stating that the Bram language Taylor cites as support for his per se argument "has never been applied with [a] wooden literalness"), the statement cited by Taylor does not create a per se involuntariness rule for statements uttered in the give-and-take context of informal immunity bargaining.[5]

Thus, we hold that Taylor's Bancoshares testimony was not per se "involuntary" simply because it was given in exchange for a promise of benefits from the government.[6] We must

_____

[5] Indeed, the Bram Court itself did not apply a per se rule to hold that Bram's statements were involuntary, but engaged in a totality of the circumstances analysis, concluding that "when all the surrounding circumstances are considered in their true relations, . . . the claim that the statement was voluntary [is] overthrown." Bram, 168 U.S. at 562, 18 S.Ct. at 194.

[6] We have found one case in our own circuit that appears to support Taylor's argument. In Gunsby v. Wainwright, 596 F.2d 654 (5th Cir. 1979) (In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981), a panel of our court held that a defendant's deposition testimony made "as a result of" plea bargain promises was "legally involuntary and inadmissible at [the defendant's] state trial." Id. at 656. Importantly, the

12

therefore determine whether Taylor's testimony was involuntary without the benefit of Taylor's proposed rule.

2.

Taylor claims that when the circuit court stated at Taylor's pre-Kastigar hearing that Taylor's Bancoshares testimony was "compelled," the court was making a factual finding of involuntariness. He suggests, therefore, that this "finding" is entitled to a presumption of correctness on review. See Bolender v. Singletary, 16 F.3d 1547, 1552 n.1 (11th Cir. 1994) (stating that a federal court reviewing a state prisoner's habeas corpus petition must afford a presumption of correctness to the factual findings of both the state trial court and state appellate courts). Regardless of the import of the circuit court's statement, however, it is well established that voluntariness is a legal, not a factual issue. See Medina v. Singletary, 59 F.3d 1095, 1101 (11th Cir. 1995) (citing Arizona v. Fulminante, 499 U.S. 279, 287, 111 S.Ct. 1246, 1252, 113

---

government entity that sought to use the witness' testimony against him in Gunsby (the state of Florida) had previously promised not to use the testimony against him pursuant to a plea bargain. When the witness gave different testimony than he had agreed to under the plea bargain, the State declared the bargain null and void and sought to introduce the witness' testimony against him at trial. The Gunsby court held that the State was barred from doing so.

Taylor would interpret Gunsby to stand for the proposition that any testimony given in exchange for benefits under an immunity agreement is involuntary and therefore inadmissible. In light of Bordenkircher, however, we believe that Gunsby stands for an entirely different proposition – that the government may not profit from a witness' change of heart; a witness who, in good faith, testifies under what he believes is an intact agreement, may not later be harmed by that testimony if the agreement falls apart. This "rule" is akin to the rule in a plea bargain situation that an otherwise valid plea given in exchange for an unfulfilled or unfulfillable promise is considered "involuntary." See United States v. Hill, 564 F.2d 1179, 1180 (5th Cir. 1977) (holding that "a guilty plea induced by a court-approved promise that could not be fulfilled cannot be viewed as voluntary").

13

L.Ed.2d 302 (1991)).[7]  Thus, any "finding" the circuit court made is not now entitled to a

---

[7]  The circuit court's statement that Taylor's testimony was "compelled" also was based on an erroneous view of the law.  The court equated an informal immunity agreement with a formal grant of immunity under the federal immunity statute, 18 U.S.C. §§ 6001-6003 (1994), and therefore concluded that an informal immunity agreement provides the same protections as does a statutory grant of immunity.  The court's analogy, however, is flawed.

A grant of immunity under the federal immunity statute "overrides" a witness' Fifth Amendment privilege by granting protection equal to that provided by the privilege.  Once a witness has invoked the privilege, if the Attorney General of the United States (or her agent) determines that "the public need for the [witness'] testimony" is great enough, see In re Daley, 549 F.2d 469, 478 (7th Cir. 1977), she may ask the court to grant the witness immunity under 18 U.S.C. § 6003.

> Once a witness is immunized under § 6003, the witness
> may not refuse to comply with [an order to testify over a claim of privilege] on
> the basis of his privilege against self-incrimination; but no testimony or other
> information compelled under the order (or any information directly or indirectly
> derived from such testimony or other information) may be used against the
> witness in any criminal case, except a prosecution for perjury, giving a false
> statement, or otherwise failing to comply with the order.

18 U.S.C. § 6002.  Thus, the court may compel a statutorily-immunized witness, by an order backed by threat of contempt sanctions, to testify.  This compulsion does not violate the Fifth Amendment, however, because the witness will never be compelled to be a witness against himself; the statute precludes any government entity, state or federal, from using the witness' compelled testimony against him at a subsequent criminal trial.  See United States v. Byrd, 765, F.2d 1524, 1530 (11th Cir. 1985) ("So long as none of the evidence presented to the grand jury is derived, directly or indirectly, from the [defendant's] immunized testimony, it can fairly be said that the defendant's immunized testimony has not been used to incriminate him.").  Because the Fifth Amendment does not guarantee a right to freedom from compulsion, but a right to freedom from criminal penalties inflicted based on compelled testimony, see United States v. Gecas, 120 F.3d 1419, 1429 & n.13 (11th Cir. 1997) (en banc), this immunization is sufficient to satisfy the dictates of the Self-incrimination Clause because it effectively prevents the later use of the testimony to incriminate the witness.  A grant of statutory immunity thus displaces the witness' Fifth Amendment privilege, but preserves the witness' Fifth Amendment right.  See Kastigar, 406 U.S. at 461, 92 S.Ct. at 1665 (stating that the immunity provided under the statute is "commensurate with that resulting from invoking the [Fifth Amendment] privilege itself").

Absent a formal statutory grant of immunity, however, a court may not constitutionally compel a witness to testify over a valid assertion of his privilege.  See Pillsbury v. Conboy, 459 U.S. 248, 256-57, 103 S.Ct. 608, 614, 74 L.Ed.2d 430 (1983) ("[A] District Court cannot compel [a witness] to answer deposition questions, over a valid assertion of his Fifth Amendment right, absent a duly authorized assurance of [statutory] immunity at the time."); see also United States v. Doe, 465 U.S. 605, 616, 104 S.Ct. 1237, 1244, 79 L.Ed.2d 552 (1984) (holding that the defendant could not be compelled to produce documents without a statutory grant of use

14

presumption of correctness.  Because neither the state court nor the district court made specific findings of fact regarding the circumstances surrounding Taylor's Bancoshares testimony, we look to the record ourselves to determine whether the totality of the circumstances supports a conclusion of involuntariness.

We find that there is nothing to suggest that Taylor testified involuntarily at the Bancoshares trial.  He clearly did not take the stand in the Bancoshares trial involuntarily, and we believe the following excerpt from the state court's pre-Kastigar hearing establishes that Taylor did not involuntarily enter the immunity agreement pursuant to which he testified:

| | |
|---|---|
| [the court]: | Okay.  In this agreement you went to the – met with the United – the Assistant U.S. Attorney with your attorney and drew up this agreement? |
| [Taylor]: | Yes. |
| Q. | And you agreed to testify or provide information. |
| A. | That's correct. |
| Q. | And you weren't compelled in any way to appear and enter into this agreement were you? |

---

immunity despite the Government's repeated oral promises to the court that it would not use the act of production against the defendant); cf. In re Corrugated Container Antitrust Litigation, 620 F.2d 1086, 1094 (5th Cir., 1980) (holding that the district court has no power to grant immunity outside that authorized by the federal immunity statute itself).  Thus, an informally-immunized witness retains his Fifth Amendment privilege in a court proceeding even if he has agreed to waive that privilege in return for benefits under the agreement.  If he chooses to invoke his privilege, he will suffer only the loss of those bargained-for benefits – benefits he was not otherwise entitled to receive under any law, let alone the Constitution.

Because he retains his Fifth Amendment privilege, he must invoke that privilege if he wishes to preclude the use of the testimony against him in a criminal case; he cannot later claim that he was "compelled" to testify simply because he fulfilled his promise to the prosecutor and did not invoke the privilege.  The state court's reliance on the Barker dicta, therefore, is unfounded; Taylor was not "compelled" to testify at the Bancoshares trial and therefore was not entitled, under the Fifth Amendment, to a Kastigar hearing to determine whether the State Attorney had used his Bancoshares testimony to bring the state indictment.  Accord United States v. Turner, 936 F.2d 221 (6th Cir. 1991); United States v. Brothers, 856 F.Supp. 380 (M.D. Tenn. 1993).

A.                 Meaning by compelled was I coerced, a bit of coercion was used.

Q.                 What was the coercion?

A.                 Threat of prosecution.

Q.                 Okay. But that's the only reason you went and made that agreement, that you thought you might be prosecuted.

A.                 No. I wouldn't say that.

Q.                 Okay. Then what was the reason you entered into this agreement?

A.                 I think the main thing is I wanted to get it all behind me.

Q.                 Okay. So you voluntarily entered into this agreement and said, "I'll give you this information – "

A.                 Yes, I voluntarily did it, yes.

Thus, Taylor's first argument – that the Due Process Clause prevented the state court from admitting his Bancoshares testimony because that testimony was involuntary – fails.

B.

Taylor also claims that under his informal immunity agreement, he was entitled to use immunity in the state court for any statements given pursuant to the agreement. He argues, therefore, that the agreement was breached when the circuit court allowed the prosecutor to impeach him using his Bancoshares testimony. He contends that due process requires that a writ of habeas corpus issue to remedy the state's breach of the agreement. See United States v. Harvey, 869 F.2d 1439, 1444 (11th Cir. 1989) (en banc) (stating that "due process requires us to enforce the government's agreement"); Rowe v. Griffin, 676 F.2d 524, 528 (11th Cir. 1982) ("[D]ue process requires that the prosecutor's promise be fulfilled."). We hold that the agreement did not bind the state of Florida and therefore could not have required the circuit court to prevent the prosecutor from impeaching Taylor with his Bancoshares testimony. Thus, Taylor is not entitled to habeas relief on this ground.

16

When enforcing an immunity agreement, we look to the terms of the agreement itself, determined by applying common law contractual principles. See United States v. Thompson, 25 F.3d 1558, 1561 (11th Cir. 1994) ("In determining the extent of immunity afforded a defendant under an [informal] immunity agreement, a court should apply basic principles of contract law.") The district court in this case found that Taylor's agreement did not on its face bind state authorities. We agree.

The agreement itself plainly states that it "is limited to the United States Attorney's Office for the Southern District of Florida and cannot bind other federal, state of [sic] local prosecuting authorities."[8] Taylor points to the preceding sentence, "[f]urthermore, no information so disclosed by James Taylor during the course of his co-operation will be used against him," as providing him state immunity. That sentence, however, must be read in context; it refers to Taylor's cooperation with the Southern District of Florida authorities and follows a statement concerning Taylor's involvement in specific crimes within the Southern District. Thus, Taylor's quoted sentence only obligates the United States Attorney for the Southern District not to use the information, and perhaps not to disseminate it to other law enforcement authorities.[9] The agreement on its face, therefore, does not support a finding that Taylor was entitled to use immunity in state court.

Taylor, however, claims that the United States Attorney made a "side deal" with him that altered the terms of the agreement and entitled him to state use immunity. We find – as the

_____

[8] We set forth the entire agreement in footnote 2, supra.

[9] There is no evidence that the United States Attorney so disseminated any information provided pursuant to the informal immunity agreement; Taylor only challenges the use of his Bancoshares testimony, which was a matter of public record.

17

district court did – that Taylor's "bare, conclusory allegation of an oral modification to the written agreement is insufficient, without more, to warrant further evidentiary consideration." Thus, the agreement did not provide Taylor with such immunity. Taylor's second and final argument – that the circuit court denied him due process by failing to enforce his informal immunity agreement – fails.[10]

III.

For the foregoing reasons, the district court's denial of Taylor's petition for writ of habeas corpus is

AFFIRMED.

---

[10] Taylor may have relied on the circuit court's erroneous pre-trial ruling that he was entitled to a <u>Kastigar</u> hearing – thereby implying that he had been afforded the equivalent of statutory immunity – when deciding whether to testify on his own behalf and thus expose himself to the prosecutor's use of his Bancoshares testimony on cross-examination. We need not decide whether the circuit court's misinterpretation of the law constituted a denial of due process, however, because Taylor has not raised the issue in his petition.