The PEOPLE of the State of Colorado, Plaintiff–Appellee,

v.

Ricky WICKHAM, Defendant–Appellant.

No. 99CA2087.

Colorado Court of Appeals, Div. II.

Nov. 23, 2001.

Certiorari Denied Sept. 16, 2002.*

---

* Justice COATS does not participate.

Ken Salazar, Attorney General, Evan W. Jones, Assistant Attorney General, Denver, CO, for Plaintiff–Appellee.

David S. Kaplan, Colorado State Public Defender, Martin Gerra, Deputy State Public Defender, Denver, CO, for Defendant–Appellant.

Opinion by Judge ROTHENBERG.

Defendant, Ricky Wickham, appeals the judgment of conviction entered on a jury verdict finding him guilty of felony murder, robbery, and aggravated motor vehicle theft. We vacate the robbery conviction and otherwise affirm.

In October 1998, defendant's companion stabbed the victim repeatedly until he died, while defendant assisted. The two assailants then stole the victim's ATM card, his wallet, a cell phone, a pager, two VCRs, and stereo equipment. They loaded these belongings into the victim's car and drove away in it.

After the police found the victim's body, defendant's parole officer identified defendant in ATM surveillance videos that showed defendant withdrawing funds from the victim's bank account. The police later obtained a warrant to search defendant's house for items stolen from the victim.

Sixteen days after the murder, defendant was arrested on an existing warrant for violating his parole, and the police searched his house pursuant to the search warrant. They uncovered several pieces of incriminating evidence.

## I.

■ Defendant first contends that his videotaped confession was involuntary and that the trial court violated his right to due process by admitting it into evidence. We disagree.

■ The trial court initially viewed the videotaped confession, found it was voluntary, and admitted it. Because neither party contests the facts that controlled the trial court's determination whether to admit the videotaped confession, we review its admission de novo. See People v. Valdez, 969 P.2d 208 (Colo.1998)(when no dispute remains regarding the controlling facts, question on appeal is one of law and is reviewed de novo).

■ Involuntary confessions must be excluded under the Due Process Clause. Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964); People v. Raffaelli, 647 P.2d 230 (Colo.1982). For a confession to be involuntary, police coercion must have played a significant role in obtaining it. Colorado v. Connelly, 479 U.S. 157, 164, 107 S.Ct. 515, 520, 93 L.Ed.2d 473, 482 (1986)("all [confession cases] have contained a substantial element of coercive police conduct"); People v. Miranda–Olivas, 41 P.3d 658 (Colo. 2001); People v. Gennings, 808 P.2d 839, 843 (Colo.1991) ("[a] confession or inculpatory statement is involuntary if coercive governmental conduct played a significant role in inducing the statement").

■ In determining whether the confession here was involuntary, the inquiry is whether defendant's will was overborne by physically or mentally coercive government conduct. People v. Valdez, supra. However, even where a causal connection exists between police misconduct and the defendant's confession, a violation of due process does not automatically ensue. Colorado v. Connelly, supra (n.2). Rather, the court must look at the totality of the circumstances. See Arizona v. Fulminante, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991).

We initially observe that defendant relies upon earlier opinions, including one by the United States Supreme Court, that held confessions were per se involuntary when elicited using threats or promises. See Bram v. United States, 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897); People v. Pineda, 182 Colo. 385, 513 P.2d 452 (1973). In later cases, however, the per se approach has been criticized, and the current weight of authority now holds that the totality of circumstances should be applied in analyzing the voluntari-

ness of confessions. *See Arizona v. Fulminante, supra; see also Taylor v. Singletary*, 148 F.3d 1276 (11th Cir.1998)(stating that the language in *Bram* advocating a per se rule on voluntariness was dicta and that other language there suggested a totality of circumstances approach); *People v. McCormick*, 881 P.2d 423 (Colo.App.1994)(*Bram* language was dicta and the correct standard is totality of the circumstances, as set forth in *Arizona v. Fulminante, supra*).

■ Accordingly, we look to the totality of the circumstances in analyzing the voluntariness of defendant's videotaped confession. *See Arizona v. Fulminante, supra; People v. Miranda–Olivas, supra; People v. Gray*, 975 P.2d 1124 (Colo.App.1997).

■ Threats and promises used by the interrogator factor into the analysis of voluntariness but are not conclusive. For such threats and promises to render a confession involuntary, they must have caused the defendant to confess, for example, where police have promised leniency in exchange for a confession or have threatened harmful consequences unless the defendant confesses. *See People v. Valdez, supra* (requiring a causal connection between abrasive demeanor of interrogator and the defendant's confession for it to be involuntary); *see also United States v. Fraction*, 795 F.2d 12, 15 (3d Cir.1986)(defining a promise in the context of a confession as "an offer to perform or withhold some future action within the control of the promisor, in circumstances where the resulting action or inaction will have an impact upon the promisee").

Other appropriate factors to be considered include:

whether the defendant was in custody or was free to leave and was aware of his situation; whether *Miranda* warnings were given prior to any interrogation and whether the defendant understood and waived his *Miranda* rights; whether the defendant had the opportunity to confer with counsel or anyone else prior to the interrogation; whether the challenged statement was made during the course of an interrogation or instead was volunteered; whether any overt or implied

threat or promise was directed to the defendant; the method and style employed by the interrogator in questioning the defendant and the length and place of the interrogation; and the defendant's mental and physical condition immediately prior to and during the interrogation, as well as his educational background, employment status, and prior experience with law enforcement and the criminal justice system.

*People v. Gennings, supra*, 808 P.2d at 844.

In support of defendant's assertion here that his confession was involuntary, he relies on several cases. We conclude each is distinguishable.

*People v. Pineda, supra*, applied the per se rule regarding threats and promises in determining whether the defendant's confession was involuntary. Because the per se rule is no longer applied by the United States Supreme Court or in more recent Colorado cases, *Pineda* does not require us to accept defendant's argument.

The same is true of *People v. Gennings, supra*. There, the supreme court reversed the trial court's finding that the defendant's statement was involuntary, after concluding the finding was unsupported by the record:

[W]e cannot say with any assurance that the polygraph examiner's conduct played so significant a role in overbearing the defendant's will as to have caused the defendant's statement to be constitutionally involuntary.

*People v. Gennings, supra*, 808 P.2d at 846–47.

Defendant's reliance on *People v. Quintana*, 198 Colo. 461, 601 P.2d 350 (1979), is also misplaced. While the supreme court there upheld the trial court's finding that the defendant's confession was involuntary, the police had promised him leniency and assistance in exchange for his confession. Such promises were not made to defendant here.

Nor does *People v. Freeman*, 668 P.2d 1371 (Colo.1983), require a different result. After examining the record, the supreme court there concluded the defendant's statement was involuntary based on several coercive techniques that had been used by multiple interrogating officers. Those techniques

included: (1) referring to charges that the defendant might face if not cleared; (2) minimizing the seriousness and extent of the defendant's culpability if he confessed; (3) telling the defendant that he could not talk to his girlfriend unless he confessed; (4) employing a "Mutt and Jeff" tactic in which one officer berated the defendant while another reassured and complimented him; and (5) making false representations regarding their knowledge of the evidence and asserting the defendant was obviously guilty. *People v. Freeman, supra,* 668 P.2d at 1379–80. Again, such conduct did not occur in this case.

*People v. Valdez, supra,* offers more guidance. There, multiple officers had interrogated the defendant. The court considered the totality of the circumstances and was persuaded by several factors to conclude the defendant's confession was voluntary. The factors recited were: (1) a lack of a causal connection between the angry, condemning demeanor of one interrogator and the confession; (2) the absence of a nexus between the defendant's alleged confusion with respect to the questioning and the confession; and (3) the fact that the interview only lasted an hour and twenty minutes, even though the defendant claimed to have been tired and hungry. The supreme court also found ·significant the fact that the defendant denied the charges throughout the interview, that he understood the meaning and extent of his rights and waived them, and that he was given water and never asked for food. *People v. Valdez, supra,* 969 P.2d at 212–13.

Here, following defendant's arrest, he was given *Miranda* warnings before any questioning, and he waived his rights. Evidence also was presented that he was mentally and physically healthy before and during the questioning, that he was not intoxicated, that he did not suffer from mental illness, that he never mentioned being tired to the detective, that he had successfully earned a GED diploma, and that he had prior experience in the juvenile criminal justice system. In fact, he was on parole at the time of this offense.

Defendant also appeared lucid during the interview, which lasted approximately five hours and took place in a typical police interrogation room. Defendant was given breaks, beverages, and cigarettes, and while the interview was long, the length of the questioning was caused by the fact that he changed his story several times.

We acknowledge, as do the People, that the detective made two comments that may be interpreted as promises. He said, "Keep on telling me. This is what's going to help you, bud. Tell me." Before defendant confessed to the final version of his story, the detective also stated: "I can't help you and go to bat for you if I know I don't get all the story because I can't put myself on the line knowing that I don't know all the facts." However, the detective never told defendant he would provide specific help in exchange for defendant's confession.

Defendant also contends the detective threatened him by telling him he would suffer adverse consequences if the investigators found evidence against him. Defendant's confession followed the detective's suggestion that defendant's companion, when arrested, would implicate defendant and that defendant had one last chance to respond to the questions. Nevertheless, the detective never threatened any action against defendant if he refused to confess, and the videotape shows the detective's tone throughout the interview was not overbearing.

While we do not condone the detective's conduct in misrepresenting the scope of the charges defendant faced and the extent of his knowledge concerning fingerprint evidence, this conduct nevertheless does not compel a conclusion that defendant's statement was involuntary. *See Frazier v. Cupp,* 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969); *Lucero v. Kerby,* 133 F.3d 1299 (10th Cir.1998)(interviewer's admittedly false statements regarding fingerprint evidence did not make confession involuntary without more evidence of coercion).

We therefore conclude the trial court did not err in determining that defendant's confession was voluntary and in admitting it at trial. *See People v. Valdez, supra.*

## II.

Defendant next contends the trial court erred in permitting his wife to testify

against him in violation of his due process rights. However, defendant has not cited to, nor are we aware of, any case law suggesting that the marital privilege is a constitutional right. *See In re Marriage of Bozarth*, 779 P.2d 1346, 1348 (Colo.1989)(stating that the marital privilege is a "statutory privilege"); *see also People v. Thompson*, 950 P.2d 608 (Colo.App.1997)(stating that the marital privilege developed from the common law without reference to any constitutional rights).

### III.

■ We also reject defendant's contention that the trial court erred in permitting his wife to testify against him in violation of the marital privilege established in § 13–90–107(1)(a)(II), C.R.S.2001.

Before the wife testified, the trial court stated its interpretation and application of the privilege statute, and the following brief colloquy occurred:

Court: Okay.... Both counsel [for the People and for the wife] are of the view that the privilege would not apply because we have a prosecution of first degree murder. [Defense counsel], do you want to jump in here or not?

Defense Counsel: No, Your Honor. Thank you.

■ Because defendant did not make a specific objection to the wife's testimony based on privilege, we apply the plain error standard of review to this alleged error. *See Wilson v. People*, 743 P.2d 415 (Colo.1987)(an error in trial proceedings to which an accused fails to make a contemporaneous objection will not be the basis for reversal unless it casts serious doubt upon the basic fairness of the trial itself); *see also* Crim. P. 52(b)(plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court).

Section 13–90–107(1)(a)(I) provides, in pertinent part, that:

a husband shall not be examined for or against his wife without her consent, nor a wife for or against her husband without his consent; nor during the marriage or afterward shall either be examined without the consent of the other as to any communications made by one to the other during the marriage....

This portion of the statute thus allows the defendant-spouse to prevent the other spouse from testifying based on marital privilege.

However, the first sentence of § 13–90–107(1)(a)(II) provides that if, as here, the defendant spouse is charged with a class one, two, or three felony under § 18–1–105(1)(a)(IV) to (V), C.R.S.2001, the above privilege does not apply. Under those circumstances, the applicable statutory privilege is set forth in the second sentence of § 13–90–107(1)(a)(II), which, as relevant here, states that:

In this instance, during the marriage or afterward, a husband shall not be examined for or against his wife as to any communications intended to be made in confidence and made by one to the other during the marriage without his consent, and a wife shall not be examined for or against her husband as to any communications intended to be made in confidence and made by one to the other without her consent.

Under this section, the privilege not to testify may *only* be exercised by the testifying spouse, who in this case was defendant's wife. The defendant spouse may not invoke the privilege under this section.

A portion of the first degree murder statute, § 18–3–102(4), C.R.S.2001, also abrogates the marital privilege, but it applies only to first degree murder charged under § 18–3–102(1)(f) (knowingly causing the death of a child under the age of twelve). It does not abrogate the marital privilege in felony murder cases, as here, or in cases involving first degree murder after deliberation. Thus, it has no application in this case.

Here, the error by the court and counsel occurred because, read alone, the first sentence of subsection (1)(a)(II) would seem to extinguish the marital privilege with respect to class one, two, or three felonies. It does not do so. The second sentence sets forth the privilege as it applies to such felonies and limits such privilege to the testifying spouse.

The holder of the marital privilege—individually or through his or her counsel—may waive its protections if the privilege holder, by words or conduct, abandons the claim of confidentiality. *See Cummings v. People,* 785 P.2d 920 (Colo.1990). The party seeking to overcome the privilege has the burden of showing the privilege holder has expressly or impliedly forsaken the claim of confidentiality.

In *Cummings v. People, supra,* the privilege holder, who was the defendant spouse, successfully moved to prevent his wife from testifying against him at his trial for two counts of first-degree murder. The defendant there relied on § 13–90–107(1)(a)(I). At trial, however, the court ruled that the defendant had impliedly waived the statutory privilege when his counsel, during opening statement, accused the defendant's wife of committing the two murders.

The supreme court upheld the trial court's ruling, explaining that "it would be the ultimate irony if one spouse can, under the guise of 'squealing' on the other, silence the other's response to [the defendant's] charges." *Cummings v. People, supra,* 785 P.2d at 926 (quoting *People v. Worthington,* 113 Cal. Rptr. 322, 326, 38 Cal.App.3d 359, 365 (1974)). The *Cummings* court added: "The holder of the privilege will not be permitted to 'absolve himself [or herself] from liability and at the same time assert the privilege in order to prevent the other party from ascertaining the truth of the claim.'" *Cummings v. People, supra,* 785 P.2d at 926 (quoting *Clark v. District Court,* 668 P.2d 3, 10 (Colo. 1983)).

Counsel for the privilege holder also may waive the marital privilege by failing to object to the testimony of the adverse spouse. *See Burlington Northern R.R. Co. v. Hood,* 802 P.2d 458 (Colo.1990)(citing *United States v. Figueroa–Paz,* 468 F.2d 1055, 1057 (9th Cir.1972)).

In this case, before addressing the issue of privilege, the trial court acknowledged that defendant's wife had a right under the Fifth Amendment to refuse to testify because it might incriminate her. In response, the wife's court-appointed counsel advised the court that he had spoken to his client and the prosecutor and that the People were offering the wife immunity in exchange for her testimony. Counsel presented the court with an application for immunity signed by the district attorney, and at the prosecution's request, the trial court granted the application.

The privilege issue then arose, and the wife's counsel advised the trial court he had spoken to his client and that:

> she indicated that she may have a 13–90–107 privilege. After reviewing the statute, I don't believe there is a spousal privilege, Your Honor.

The record makes it clear that the wife's attorney mistakenly believed the marital privilege did not apply because defendant was charged with first degree murder. The prosecutor similarly asserted—also erroneously—that the marital privilege did not apply. Thus, while the trial court required the wife to testify after granting her immunity, the court apparently acted on her counsel's erroneous belief that the privilege statute did not apply to class one, two, or three felonies. The trial court also brought this issue to defense counsel's attention, and counsel did not object.

On appeal, the parties agree, as do we, that this construction of the marital privilege statute was erroneous and that the applicable privilege in this case derives from § 13–90–107(1)(a)(II). The marital privilege applied under that section, but only the witness-spouse could assert or waive the privilege. *See People v. Thompson, supra.*

The issue, however, on which the People and defendant cannot agree, and which is presented here, is whether defendant is entitled to reversal of his conviction based on this error of law. We conclude there was no plain error that requires reversal.

Because failing to object to testimony by an adverse spouse has been held to waive the privilege, no reversible error occurs where the witness-spouse is allowed to testify after the defendant-spouse fails to object on the grounds of privilege under § 13–90–107(1)(a)(I). *Cf. Cummings v. People, supra,* 785 P.2d at 926 (citing *People v.*

*Odmann,* 160 Cal.App.2d 693, 325 P.2d 495 (1958)). We similarly conclude that where, as here, the witness-spouse has failed to claim a marital privilege and make a timely objection to his or her own testimony, the witness-spouse has waived the privilege, and on appeal the defendant-spouse may not successfully contest the issue under § 13–90–107(1)(a)(II). It makes no difference to our analysis in this case that wife's counsel provided inaccurate advice.

Further, because defendant was charged with a class one felony, he was not entitled to raise the marital privilege. Only his wife was entitled to do so under § 13–90–107(1)(a)(II). The record reflects that her counsel raised the privilege issue with the trial court, that she also was formally granted immunity by the district attorney with the permission of the court, and that her counsel allowed her to testify after accepting the grant of immunity. We conclude her counsel impliedly waived the privilege for her by accepting immunity and allowing her to testify.

Accordingly, we reject defendant's contention that the ruling of the trial court permitting his wife to testify against him violated the marital privilege statute and constituted plain error.

### IV.

 Defendant next contends the search warrant for his home was defective because too much time lapsed between the commission of the crime and the execution of the warrant. We disagree.

 The Fourth Amendment of the United States Constitution and article II, section 7, of the Colorado Constitution prohibit the issuance of a search warrant except upon probable cause supported by oath or affirmation particularly describing the place to be searched and the things to be seized. *People v. Leftwich,* 869 P.2d 1260 (Colo.1994).

 In the context of search warrants, probable cause means reasonable grounds to believe that contraband or evidence of criminal activity is located in the area to be searched. *People v. Melgosa,* 753 P.2d 221 (Colo.1988). The element of time is crucial to determining the presence of probable cause. *People v. Montoya,* 44 Colo.App. 234, 616 P.2d 156 (1980).

 The existence of probable cause is determined by considering the totality of the circumstances known to the officer at the time of the search. A reviewing court does not analyze the finding of probable cause *de novo.* Instead, it must ensure that a magistrate had a substantial basis for concluding probable cause existed. *People v. Leftwich, supra.*

Defendant relies on *United States v. Van Ert,* 350 F.Supp. 1339 (E.D.Wis.1972), and *People v. Erthal,* 38 Colo.App. 245, 556 P.2d 1228 (1976), *aff'd,* 194 Colo. 147, 570 P.2d 534 (1977), to support his contention that the warrant lacked probable cause.

In *United States v. Van Ert, supra,* the federal district court found a search warrant lacked probable cause because investigators had executed it fifty-five days after it was issued. Similarly, in *People v. Erthal, supra,* the court held a warrant lacked probable cause when almost two months elapsed between the time the investigators observed stolen items on the premises and the issuance of the warrant.

While those cases offer guidance, we are more persuaded by *People v. Thrower,* 670 P.2d 1251 (Colo.App.1983). There, the police investigated a murder and obtained a warrant to search the defendant's home for a handgun, bullets, bullet shells, and a black shirt allegedly worn the day of the murder. The murder occurred almost two months before the warrant was issued, but the police did not have evidence linking the defendant to the crime until the day before they obtained the warrant.

The items sought in *Thrower* were similar to the items listed in the warrant here, which defendant now argues could have easily been disposed of between the murder and the issuance of the warrant. However, the panel in *Thrower* concluded there was probable cause to support the search warrant because it took police almost two months to obtain evidence linking the defendant to the crime scene. *People v. Thrower, supra.*

Similarly here, the police did not link defendant to the crime until his parole officer identified him in the video ten days after the body was discovered, and it was only after the police identified defendant as a suspect that they established probable cause to obtain the search warrant for his home. *See People v. Thrower, supra.* Although the search warrant in this case was issued fourteen days after the police found the victim's body and executed two days later, that was a significantly shorter period than elapsed in *Van Ert, Erthal,* and *Thrower.* While the items sought in the warrant were easily disposable, there nevertheless was reason to believe defendant still had them in his possession. The affidavit supporting the warrant stated that the Denver Police Pawn Detail Unit had checked and found no signs that the items had been pawned. The trial court also found it plausible that defendant could have been using the stolen items.

We thus conclude probable cause existed to search defendant's home for the stolen items, despite the passage of more than two weeks between the victim's death and the search.

### V.

Defendant's final contention, which the People concede, is that his conviction for robbery should be vacated because it was the underlying felony supporting the felony murder conviction. *See People v. Bartowsheski,* 661 P.2d 235 (Colo.1983); *People v. Jones,* 990 P.2d 1098 (Colo.App.1999). We agree, vacate the robbery conviction, and remand for correction of the mittimus to so reflect.

The judgment of conviction for robbery is vacated, and the case is remanded for correction of the mittimus. In all other respects, the judgment is affirmed.

Judge JONES and Judge NIETO concur.