[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 23-11114

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

STEVEN GEORGE MORGAN,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 0:22-cr-60140-WPD-1

_____

Before ROSENBAUM, NEWSOM, and MARCUS, Circuit Judges.

NEWSOM, Circuit Judge:

A jury convicted Steven Morgan of three drug-trafficking crimes after finding that he had been running cocaine from the Caribbean into South Florida. On appeal, Morgan advances five grounds for reversing his conviction—chief among them whether either the Fourth or Fifth Amendment required excluding the contents of a cellphone that the government searched without a warrant. Morgan also challenges several evidentiary rulings. After carefully considering the issues, and with the benefit of oral argument, we reject Morgan's contentions and affirm his conviction.

**I**

**A**

With his brother, Steven Morgan smuggled cocaine into South Florida. According to the evidence at trial, their scheme worked as follows: Morgan would ship jars of shaving gel to his brother on the island of St. Maarten, in the Caribbean. Morgan's brother would fit the jars with false bottoms, under which he'd stash cocaine. The brother would then ship the drug-laden jars back to various South Florida addresses, where Morgan would retrieve them.

The scheme began to unravel when a couple of diligent law-enforcement dogs at a Puerto Rican airport alerted on three packages—each of which contained about two pounds of cocaine. In an effort to identify the packages' intended recipients, law-

enforcement agents set up a controlled delivery. After removing the cocaine, the officers equipped the boxes with break-wire beacons and then shipped them to their original destinations. After the packages were left in front of a South Florida apartment, Morgan and another man arrived, retrieved them, and went inside. The beacon sounded about 15 minutes later, cueing the officers to burst into the apartment.

Once inside, the officers saw Morgan standing near the back porch. When they detained him, Morgan had a gun on him. As particularly relevant here, the officers also found two cellphones near Morgan: an iPhone and an LG. Having put Morgan in handcuffs, Agent Christiana Feo asked him—without providing *Miranda* warnings[1]—whether both phones were his. Morgan answered, "yes." Tr. of Supp. Hearing 32, Dkt. No. 115.

The officers then placed Morgan in their vehicle, where Agent Mariana Gaviria read him his *Miranda* rights. Morgan responded by invoking his rights to silence and counsel. Not long thereafter, Gaviria asked Morgan—again—if the two phones that the agents had seized belonged to him. Morgan hesitated, saying that he was "not sure." *Id.* at 14. Gaviria told him that she "wasn't trying to interrogate him or ask him any questions about the case" and that she "just need[ed] to know if they belonged to him so that [she] could make a note of who the property belonged to in case [she] needed to return it." *Id.* In reply, Morgan said that "only the

---

[1] *See Miranda v. Arizona*, 384 U.S. 436, 478–79 (1966).

iPhone" was his. *Id.* He explained that he had earlier claimed own-ership of both phones only due to his "shock because of the way that [the agents] came into the apartment with the guns drawn"—"but," he reiterated, "only the iPhone was his." *Id.*

After seizing both phones and the gun, the officers released Morgan. A few days later, Morgan called one of the agents to re-trieve his gun, but he never asked about the phones. Several weeks after seizing it, the agents conducted a warrantless search of the LG phone, which yielded evidence implicating Morgan in the drug-running scheme—including text messages between him and his brother and photos of shipping records and wire-transfer receipts. That information also led the agents to subpoena and obtain addi-tional evidence from DHL, FedEx, and Western Union.

About 18 months after the controlled delivery, Agent Gavi-ria called Morgan to arrange a meeting because she wanted to "re-turn some property to him." Tr. of Supp. Hearing 19. Morgan agreed to meet Gaviria and two other agents at a Homeland Secu-rity Investigations office. Although the details of the exchange aren't relevant to this appeal, the evidence from the suppression hearing suggests that the agents urged Morgan to talk to them de-spite his repeated attempts to invoke his *Miranda* rights. Morgan eventually spoke to the agents for about two hours and, at the close of the interrogation, was arrested based on a previously obtained warrant.

## B

A federal grand jury charged Morgan with (1) conspiring to import 500 grams or more of cocaine, in violation of 21 U.S.C. §§ 952(a) and 963; (2) attempting to possess with intent to distribute 500 grams or more of cocaine, in violation of 21 U.S.C. § 841(a)(1); and (3) possessing a firearm in furtherance of a drug-trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A). After a four-day trial,[2] the jury found Morgan guilty on all charges. The district court sentenced Morgan to 72 months' imprisonment for the drug offenses, to run concurrently, and to 60 months' imprisonment for the gun crime, to run consecutively.

On appeal, Morgan raises five issues, which we will address in turn.

## II

The first—and most involved—question is whether the district court properly admitted the LG phone's contents based on its finding that Morgan had abandoned his Fourth Amendment interest in the device.[3]

---

[2] We will recount the key episodes before and during the trial as they become relevant.

[3] "In reviewing a district court's denial of a motion to suppress, we review the findings of fact for clear error and the application of law to those facts *de novo*." *United States v. Mercer*, 541 F.3d 1070, 1073–74 (11th Cir. 2008). We review constitutional claims de novo, *United States v. Williams*, 527 F.3d 1235, 1239 (11th Cir. 2008), but whether a defendant abandoned his Fourth Amendment

23-11114                Opinion of the Court                6

Before trial, Morgan moved to suppress the evidence from the government's warrantless search of the LG phone. He also moved to suppress his two statements concerning the phones on the day of the controlled delivery—the first, in the apartment, in which he claimed ownership of both phones, and the second, in the patrol car, in which he denied ownership of the LG phone—as well as the statements he made at the HSI office roughly 18 months later.

After a hearing, the district court suppressed the statement that Morgan made in the car that only the iPhone (and not the LG) was his, as well as the statements he made at the HSI office about 18 months later. The court allowed the government to introduce the statement that Morgan made in the apartment claiming ownership of both phones.[4] Most importantly for present purposes, the district court also decided, over Morgan's Fourth Amendment objection, to admit the LG phone's contents based on its finding that "the agents were reasonable in deciding that [Morgan] had abandoned th[at] phone." Tr. of Supp. Hearing 62–63.

On appeal, we must decide whether either the Fourth or Fifth Amendment required suppression of the LG phone's contents. We conclude that neither did. Let us explain.

---

interest in property is a factual question that we review only for clear error, *United States v. Ross*, 963 F.3d 1056, 1066 (11th Cir. 2020) (en banc).

[4] During trial, the court reversed course and decided to suppress this statement, as well.

## A

The Fourth Amendment forbids "unreasonable searches and seizures." U.S. Const. amend. IV. Its protection extends to "any thing or place with respect to which a person has a 'reasonable expectation of privacy.'" *United States v. Ross*, 963 F.3d 1056, 1062 (11th Cir. 2020) (en banc) (quoting *California v. Ciraolo*, 476 U.S. 207, 211 (1986)). A person has a Fourth Amendment interest in his cellphone, which means "that officers must generally secure a warrant before conducting . . . a search" of it. *Riley v. California*, 573 U.S. 373, 386 (2014).

"[A]n individual's Fourth Amendment rights are *not* infringed—or even implicated—by a search of a thing or place in which he has no reasonable expectation of privacy." *Ross*, 963 F.3d at 1062. And importantly here, a person loses his Fourth Amendment interest in an item of property if he abandons it. *See United States v. McKennon*, 814 F.2d 1539, 1545–46 (11th Cir. 1987). "We take an objective, common-sense approach to assessing abandonment, focusing on whether the prior possessor voluntarily discarded, left behind, or otherwise relinquished his interest in the property in question in light of his statements, acts, and other facts." *United States v. Green*, 981 F.3d 945, 956 (11th Cir. 2020) (citation modified).

The district court didn't clearly err in finding that Morgan had abandoned the LG phone and thereby given up his Fourth Amendment interest in its contents. In response to Agent Gaviria's questioning in the police car, Morgan twice said, expressly, that

"only the iPhone"—*not* the LG—was his.  We have long held that one can abandon property by verbally disclaiming ownership of it. *See, e.g.*, *United States v. Hastamorir*, 881 F.2d 1551, 1560 (11th Cir. 1989) (affirming the district court's abandonment finding where the defendant had repeatedly denied any knowledge of a car where drugs were discovered, even though his disclaimers came after the police had trained their guns on him); *United States v. Colbert*, 474 F.2d 174, 177 (5th Cir. 1973) (en banc) (finding that the defendants had abandoned their briefcases when, in response to police questions, "they both disclaimed any interest in the briefcases and began to walk away from them").[5]

To be sure, while still in the apartment, Morgan had initially told the agents that both phones were his.  But that fact alone doesn't render the district court's abandonment finding clearly erroneous.  According to Gaviria's testimony, Morgan explained his earlier statement by saying that he "must have been in shock because of the way that [the agents] came into the apartment with the guns drawn."  Tr. of Supp. Hearing 14.  He then reconfirmed that "only the iPhone was his."  *Id.*  Given that unrebutted testimony, the district court didn't clearly err in concluding that Morgan had abandoned his Fourth Amendment interest in the LG phone.

---

[5] In *Bonner v. City of Prichard*, we adopted as binding precedent all decisions handed down by the former Fifth Circuit before October 1, 1981.  661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

## B

The Fifth Amendment is also implicated in the analysis of the LG phone's admissibility, because the district court's abandonment determination rested mainly on Morgan's statements to Agents Feo and Gaviria. Morgan contends that those statements were obtained in violation of *Miranda* and, therefore, that the district court's abandonment finding—and the LG phone's contents—were "fruits of the poisonous tree."

Let's recap the district court's decisions concerning Morgan's statements: The court decided at the suppression hearing to admit Morgan's initial statement to Feo that both phones were his—but to exclude, as the product of a *Miranda* violation, the statement that he made to Gaviria in the squad car, in which he disclaimed ownership of the LG phone. Even so, the court admitted the LG's contents based on its finding that "the agents were reasonable in deciding that [Morgan] had abandoned [his Fourth Amendment interest in] the LG phone." Tr. of Supp. Hearing 62–63.

We agree with Morgan that his second statement—the one he made to Gaviria in the squad car, in which he denied owning the LG—was the product of a *Miranda* violation. Even so, we hold that the district court didn't err in relying on that statement to conclude that Morgan had abandoned the LG phone. Explaining why will require a little doing.

The Fifth Amendment's Self-Incrimination Clause provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. In *Miranda*, the

Supreme Court announced "a prophylactic [rule] to protect against violations of the Self-Incrimination Clause." *United States v. Patane*, 542 U.S. 630, 636 (2004) (plurality opinion). Using words now familiar to cops, criminals, and TV watchers everywhere, the Court decreed that police officers conducting a custodial interrogation must inform a suspect that "he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Miranda v. Arizona*, 384 U.S. 436, 479 (1966). As the Court has since emphasized, *Miranda*'s "prophylactic rule[] . . . necessarily sweep[s] beyond the actual protections of the Self-Incrimination Clause," *Patane*, 542 U.S. at 639, and, accordingly, the Court has long "distinguished police conduct that abridges a person's constitutional privilege against compulsory self-incrimination from conduct that departs only from the prophylactic standards later laid down by this Court in *Miranda* to safeguard that privilege," *Vega v. Tekoh*, 597 U.S. 134, 145 (2022) (citation modified). We explain below how that important distinction cashes out here.

**1**

At the outset, a few *Miranda* basics. *Miranda*'s demands apply only to "custodial interrogation[s]." *Garcia v. Singletary*, 13 F.3d 1487, 1489 (11th Cir. 1994). Words or actions constitute interrogation when, from the standpoint of an objective officer, they "are reasonably likely to elicit an incriminating response from the suspect." *See Rhode Island v. Innis*, 446 U.S. 291, 301 (1980) (footnote

omitted).[6]  There is, though, one pertinent exception:  Even if an interaction qualifies as a custodial interrogation, a suspect's statements might still be admissible if the officer's "questions fall within a 'routine booking question' exception which exempts from *Miranda*'s coverage questions to secure the biographical data necessary to complete booking or pretrial services." *Pennsylvania v. Muniz*, 496 U.S. 582, 601 (1990) (citation modified).

Here, it seems clear enough that Morgan's day-of-the-bust interactions with Agents Feo and Gaviria constituted interrogations.  In both the apartment and the squad car, the officers should have known that their questions about cellphones recovered at the crime scene were "reasonably likely to elicit an incriminating response" from Morgan. *Innis*, 446 U.S. at 301.

But did either exchange qualify for the "routine-booking" exception?  Some of our sister circuits have applied that exception to police questions about a suspect's ownership of property. *See, e.g.*, *United States v. Gaston*, 357 F.3d 77, 82 (D.C. Cir. 2004) (holding that an officer's questions about the defendant's address and whether he owned the house fell within the routine-booking exception because they were "related to 'administrative concerns'"); *United States v. Tapia-Rodriguez*, 968 F.3d 891, 896 (8th Cir. 2020) (holding that officers' question about which bedroom was the

---

[6] There's little doubt that Morgan was in custody after the agents handcuffed him and put him in their vehicle. *See, e.g.*, *New York v. Quarles*, 467 U.S. 649, 655 (1984) (ruling that a defendant was in custody under *Miranda* as he was "handcuffed when the questioning at issue took place").

defendant's fell within the routine-booking exception because they "had a legitimate need for the information to ensure they were conducting a lawful consensual search").

We can assume without deciding that the routine-booking exception covers the interaction with Feo, in which Morgan said that both phones were his. Perhaps not surprisingly, Morgan doesn't contest the district court's reliance on that statement at the suppression hearing; if anything, Morgan's initial claim that both phones (including the LG) were his would seem to cut against the district court's abandonment finding (though not dispositively so). *See supra* at 8.

But we reject the government's bid to extend the routine-booking exception any further—specifically, to Gaviria's questioning in the squad car that prompted Morgan to disclaim the LG phone. Given the circumstances, it strains credulity to say that Gaviria's question about the phone was meant "to secure the biographical data necessary to complete booking or pretrial services." *Muniz*, 496 U.S. at 601 (citation modified). Most importantly, while everyone was still in the apartment, Feo had *already* asked Morgan whether the phones were his—and gotten an answer. Surely that initial exchange took care of any legitimate administrative concerns the officers might have had. So even if Feo's initial questioning might have qualified for routine-booking treatment, Gaviria's follow-up questioning didn't.

In the squad car, Gaviria asked Morgan whether the phones were his—a question he'd already answered once in the

apartment—shortly after Morgan had invoked his *Miranda* rights to silence and counsel. After a suspect invokes those rights—as all agree Morgan unequivocally did—law enforcement must generally cease questioning. *See Berghuis v. Thompkins*, 560 U.S. 370, 388 (2010) ("If the right to counsel or the right to remain silent is invoked at any point during questioning, further interrogation must cease."). Here, Morgan asserted his *Miranda* rights, but Gaviria continued to quiz him about the phones. We conclude that the district court correctly held that, in so doing, Gaviria violated *Miranda*.

**2**

So, the $64,000 question: What does that portend for the district court's determination that Morgan had abandoned the LG phone—which all agree was predicated chiefly on Morgan's statements to Gaviria—and its ensuing admission of the LG's contents? For reasons we'll explain, we hold that Gaviria's *Miranda* violation didn't foreclose the district court's consideration of Morgan's statement as part of its abandonment analysis.

The Supreme Court's decision in *Patane* goes a long way toward resolving this issue. There, a three-Justice plurality ruled that a police officer's "failure to give a suspect the [*Miranda*] warnings . . . [does not] require[] suppression of the physical fruits of the suspect's unwarned but voluntary statements." 542 U.S. at 633–34. The plurality explained, as already noted, that conduct that runs afoul of *Miranda*'s dictates doesn't automatically infringe the Fifth Amendment; rather, it said, "the *Miranda* rule is a prophylactic

employed to protect against violations of the Self-Incrimination Clause." *Id.* at 636. That observation comported with established jurisprudence "distinguish[ing] police conduct that abridges a person's constitutional privilege against compulsory self-incrimination from conduct that departs only from the prophylactic standards later laid down . . . in *Miranda*." *Vega*, 597 U.S. at 145 (citation modified).

Because *Miranda*'s "prophylactic rule[] . . . necessarily sweep[s] beyond the actual protections of the Self-Incrimination Clause," the *Patane* plurality emphasized that "any further extension of [the prophylactic] rule[] must be justified by its necessity for the protection of the actual right against compelled self-incrimination." 542 U.S. at 639. Accordingly, the plurality "insist[ed] that the closest possible fit be maintained between the Self-Incrimination Clause and any rule designed to protect it." *Id.* at 641.

As the *Patane* plurality explained, "the core protection afforded by the Self-Incrimination Clause is a prohibition on compelling a criminal defendant to testify against himself at trial." *Id.* at 637. That's why the government can't use *Miranda*-violative statements in its case-in-chief. *See id.* at 639. But other uses of those statements and their fruits are fair game—so long as they are voluntary and not coerced. *See Oregon v. Elstad*, 470 U.S. 298, 307 (1985) ("[T]he *Miranda* presumption, though irrebuttable for purposes of the prosecution's case in chief, does not require that the statements and their fruits be discarded as inherently tainted."). So, for example, the Court held in *Harris v. New York* that the

government could use a voluntary statement obtained in violation of *Miranda* to impeach the defendant's testimony.  401 U.S. 222, 224–26 (1971); *see also New York v. Quarles*, 467 U.S. 649, 654–57 (1984) (holding that *Miranda*-violative statements needn't be suppressed when the questioning is conducted to address an ongoing "public safety" concern).

Most importantly here, the *Patane* plurality concluded that the Self-Incrimination Clause didn't require suppression of the defendant's unwarned but voluntary statement telling a police officer where his pistol was hidden.  *See* 542 U.S. at 634.  And in a separate concurring opinion that Justice O'Connor joined, Justice Kennedy agreed with the three-Justice plurality that "[a]dmission of nontestimonial physical fruits . . . does not run the risk of admitting into trial an accused's coerced incriminating statements against himself."  *Id.* at 645 (Kennedy, J., concurring).  Five Justices thus concluded that a violation of *Miranda*'s prophylactic rule does not necessarily require the suppression of physical evidence derived from a suspect's unwarned-but-uncoerced statement.  And unsurprisingly, we have since relied on *Patane* for precisely that proposition. *See United States v. Jackson*, 506 F.3d 1358, 1361 (11th Cir. 2007) ("Because Jackson's firearm is physical evidence and he concedes that his unwarned statement was voluntary, *Patane* allows the admission of Jackson's firearm.").

*Patane*'s logic is fatal to Morgan's position.  Morgan's statement disclaiming the LG phone is, for all intents and purposes, identical to Patane's statement telling the officer where he had

hidden his gun. *See* 542 U.S. at 635. To be sure, the precise *Miranda* violation there was a little different: In *Patane*, the police obtained the defendant's statement before they provided him any warnings; here, the agents obtained Morgan's statements after he had been warned and had invoked his rights to counsel and silence. But that's neither here nor there. What underlay the Court's decision in *Patane* wasn't the particular species of *Miranda* violation but, rather, the recognition that while *Miranda* protects Fifth Amendment rights, it isn't itself the Fifth Amendment—and therefore, that "[t]he Self-Incrimination Clause [ ] is not implicated by the admission into evidence of the physical fruit of a voluntary statement." *Id.* at 636; *accord id.* at 645 (Kennedy, J., concurring). That logic applies every bit as much to Morgan's post-warning-post-invocation statements as it did to Patane's pre-warning statement. In both circumstances the lone breach was of *Miranda*'s prophylaxis, not the Fifth Amendment proper, which is violated only when the police coerce a suspect's statement—*i.e.*, only if it isn't voluntary.

**3**

So yes, Agent Gaviria violated *Miranda* when she persisted in asking Morgan whether the phones were his despite his invocation of his rights to silence and counsel. But *Patane* makes clear that the *Miranda* violation, standing alone, is no basis for disallowing the district court's reliance on Morgan's answer as part of its abandonment analysis. The lone question is whether Morgan's answer was *voluntary*. It was.

To begin, a recap of the exchange:  When Gaviria asked Morgan whether both phones were his, he initially hesitated, saying that he was "not sure." Tr. of Supp. Hearing 14.  Gaviria continued, assuring Morgan that she "wasn't trying to interrogate him or ask him any questions about the case" but simply "need[ed] to know if they belonged to him so that [she] could make a note of who the property belonged to in case [she] needed to return it." *Id.* That's when Morgan told her that "only the iPhone was his." *Id.*

Even assuming that Gaviria's assurances were misleading, they didn't render Morgan's answer constitutionally involuntary. Here's why.

We've recognized that "the effect of psychological pressure or deception on the voluntariness of a statement depends on the particular circumstances in each case." *United States v. Farley*, 607 F.3d 1294, 1328 (11th Cir. 2010).  More specifically, we've held that "police trickery" renders a statement involuntary for Fifth Amendment purposes "only when other aggravating circumstances were also present." *Id.* (collecting cases); *accord United States v. Castaneda–Castaneda*, 729 F.2d 1360, 1363 (11th Cir. 1984) ("[T]he police's use of a trick alone will not render a confession involuntary.").

So, for instance, in *Farley*, we held that the defendant's *Miranda* waiver and later statements were voluntary even though FBI agents "tricked" him into thinking they wanted to question him about terrorism when, in fact, they were investigating him for sex crimes. 607 F.3d at 1326, 1327–30.  As we emphasized, "there [wa]s

no evidence [that the agents] made any promise that questioning would be limited to [terrorism], or gave him any assurance that statements relating to other crimes would not be used against him." *Id.* at 1329; *see also Castaneda*, 729 F.2d at 1362–64 (holding that the "interrogation was sufficiently free of coercive elements to render [the defendants'] confessions voluntary" even though the police had falsely told each defendant that the other had confessed); *cf. United States v. Spivey*, 861 F.3d 1207, 1215–17 (11th Cir. 2017) (holding that the defendants' consent to a search of their home was voluntary even though the officers came to the house on the pretext of following up on burglaries in which the defendants were victims, while their real reason was to investigate the defendants for suspected fraud).

By contrast, we've held that police deception renders a suspect's statement involuntary either (1) "where the deception took the form of a coercive threat" or (2) "where the deception goes directly to the nature of the suspect's rights and the consequences of waiving them." *Farley*, 607 F.3d at 1328–29 (collecting cases). Because no one contends that Agent Gaviria threatened Morgan, only the latter category is relevant here. Within that class of cases, we've found involuntariness only in those rare circumstances in which an officer's deception "interfere[s] with the defendant's 'ability to understand the nature of his [*Miranda*] rights and the consequences of abandoning them.'" *Id.* at 1330 (quoting *Moran v. Burbine*, 475 U.S. 412, 423–24 (1986)). As we put it in *United States v. Lall*, "[p]olice misrepresentations of law . . . are much more likely to render a suspect's confession involuntary" than

"misrepresentation[s] of fact"—which generally "are not enough." 607 F.3d 1277, 1285 (11th Cir. 2010).

A trio of cases illustrates what counts as a "misrepresentation[] of law" of the sort referenced in *Lall*. First, there's *United States v. Beale*, where one of the defendants, who couldn't speak English or read his native Spanish, signed a *Miranda* waiver only "after the FBI agents told him [in Spanish] that signing the form would not hurt him." 921 F.2d 1412, 1434 (11th Cir. 1991). On appeal, the defendant argued that his *Miranda* waiver was involuntary—and we agreed. "[B]y telling [the defendant] that signing the waiver would not hurt him," we emphasized, "the agents contradicted the *Miranda* warning that a defendant's statements can be used against the defendant in court, thereby misleading [him] concerning the consequences of relinquishing his right to remain silent." *Id.* at 1435; *cf. Miranda*, 384 U.S. at 479 (holding that police must warn a suspect "that anything he says can be used against him in a court of law").

Our decision in *Hart v. Attorney General of the State of Florida*, 323 F.3d 884 (11th Cir. 2003), is similar. After one officer read the defendant his *Miranda* rights, the defendant asked another officer, whom "he trusted," "what were the pros and cons, in her opinion, of hiring a lawyer." *Id.* at 894. In response, she told him that one of the "disadvantage[s] of having a lawyer present was that the lawyer would tell [the defendant] not to answer incriminating questions." *Id.* During the same exchange, she also told the defendant "that 'honesty wouldn't hurt him.'" *Id.* We held that the

defendant's *Miranda* waiver was involuntary because the police had misinformed him about the legal effect of not one but two of his *Miranda* rights. As we explained, "[t]he reason for requiring a lawyer during custodial interrogation is to protect a suspect's privilege against self incrimination, yet, [the officer] in effect told [the defendant] that this was the disadvantage of having a lawyer." *Id.*; *cf.* *Miranda*, 384 U.S. at 479 (holding that police must inform the suspect "that he has the right to the presence of an attorney"). And by "[t]elling him that 'honesty wouldn't hurt him,'" the officer had "contradicted the *Miranda* warning that anything he said could be used against him in court." *Hart*, 323 F.3d at 894 (footnote omitted). In our view, "[t]he phrase 'honesty will not hurt you' [wa]s simply not compatible with [*Miranda*'s] phrase [that] 'anything you say can be used against you in court.'" *Id.*

Rounding out the trio is *Lall*, where an uncounseled 20-year-old confessed after an officer "explicitly assured [him] that anything he said would not be used to prosecute him" and that the defendant "would not be charged for any statements or evidence collected on the night of the robbery." 607 F.3d at 1287. "Under these circumstances"—in which the officer's statement flatly contradicted *Miranda*'s guarantee—we held that the officer's "statements were sufficient to render [the defendant's] confession involuntary and to undermine completely the prophylactic effect of the *Miranda* warnings [the officer] previously administered." *Id.*

What ties all three cases together is that each involved affirmative "[p]olice misrepresentations of law." *Id.* at 1285. In each

case, the officers directly negated one of *Miranda*'s core protections—namely, that the suspect "has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Miranda*, 384 U.S. at 479.

Nothing of the sort occurred here. Even if we assume that Agent Gaviria was hiding her true intentions when she assured Morgan that she "wasn't trying to interrogate him or ask him any questions about the case," Tr. of Supp. Hearing 14, her statement didn't contradict any of *Miranda's* protections. Unlike in *Beale*, *Hart*, or *Lall*, Gaviria didn't tell Morgan that retaining a lawyer would hurt him, nor did she promise him that his answers wouldn't be used against him in court. Any lack of candor on Gaviria's part regarding her motive was at worst a "misrepresentation of fact"—not one of law. *See Lall*, 607 F.3d at 1285. In fact, to the extent this case has a forebear, it's *Farley*, in which the law-enforcement agents "trick[ed]" the defendant into thinking they were questioning him about terrorism when they really were investigating him for sex crimes. 607 F.3d at 1329–30. As in *Farley*, the record here includes "nothing to indicate that [Morgan] was unsure of his rights or needed them clarified"—nor that he was "deceived about 'the nature of his rights [or] the consequences of abandoning them.'" *Id.* at 1330 (quoting *Moran*, 475 U.S. at 423–24). In short,

23-11114                    Opinion of the Court                    22

even if Gaviria misled Morgan, she didn't do so in a "constitution-ally significant manner." *See id.* at 1327 (citation modified).[7]

★   ★   ★

Summing up our conclusions regarding Morgan's first argu-ment: The district court did not clearly err in finding that Morgan abandoned his Fourth Amendment interest in the LG phone. Nor did the Fifth Amendment prevent the district court from basing its abandonment ruling on Morgan's statements in the squad car. As *Patane* shows, the fruits of a *Miranda* violation remain admissible provided the challenged statement was voluntary and uncoerced. Because Agent Gaviria didn't misinform Morgan about his *Miranda* rights, his answer was voluntary, and the fruits of his statement—here, the contents of his LG phone, which were derived from a

---

[7] A final point: It's worth recalling (again) the Supreme Court's oft-repeated admonition that a bare infringement of *Miranda*'s prophylactic rule does not "constitute[] a violation of the Fifth Amendment right against compelled self-incrimination." *See, e.g.*, *Vega*, 597 U.S. at 142. Rather—again—the *Miranda* warnings "necessarily sweep beyond the actual protections of the Self-Incrim-ination Clause." *Patane*, 542 U.S. at 639. Given that fact, it seems odd—incon-gruous, even—to say that an officer's misrepresentation regarding *Miranda*'s non-constitutional rule could—without more—somehow render a suspect's statements *constitutionally* involuntary. The logic underlying that move would certainly appear to conflate *Miranda*'s court-created formulation with the Fifth Amendment proper—the very thing the Supreme Court has forbid-den. Be that as it may, our decisions in *Beale*, *Hart*, and *Lall* seem to have made that move already, and we are obliged to respect their holdings. We are not, though, obliged to *extend* their holdings. And for reasons explained above the line, Officer Gaviria didn't deceive Morgan about his *Miranda* rights in a way those cases condemn.

search that followed the officers' determination that he had abandoned it—were fair game.  We thus affirm the district court's decision to admit the LG phone's contents.

### III

As a second ground for reversal, Morgan asserts that the district court erroneously refused to grant a mistrial after a specific episode at trial.[8]

Here's the backstory:  On direct examination, Agent Feo described the controlled delivery and the scene at the apartment.  She recounted asking Morgan whether the phones belonged to him— at which point defense counsel objected.  At sidebar, the district court reconsidered its pretrial ruling, reversed course, and suppressed Morgan's initial statement to Feo that he owned both phones.  The government complied with the court's ruling and pursued another line of questioning.

When cross-examining Feo, Morgan's lawyer returned to the subject of the LG phone, specifically asking her if she knew from where on Morgan's person it had come.  Feo replied as follows:  "I don't know exactly where it came from on his person, but it came off of him because I confirmed that by speaking with him." Trial Tr. (Witness Test.) 71, Dkt. No. 121.  Shortly thereafter, in response to Morgan's lawyer's follow-up question whether Feo knew how the LG phone had made it to the apartment floor, she

---

[8] We review for an abuse of discretion the district court's denial of a mistrial. *United States v. Grzybowicz*, 747 F.3d 1296, 1311 (11th Cir. 2014).

said: "I do not know how the phone got there. I do know that he told me it was his." *Id.* at 72–73.

Defense counsel immediately moved for a mistrial on the ground that Feo had impermissibly referred to Morgan's statement—since suppressed—that both phones were his. The district court denied the motion, reasoning that Feo couldn't have heard its sidebar ruling excluding the statement. But the court did instruct the jury "to ignore Ms. Feo's answer that Mr. Morgan told her that the LG phone was his." *Id.* at 75.

The district court did not abuse its discretion in refusing to grant a mistrial. And that's so even if we were to assume—contra our earlier assumption, *see supra* at 12—that Feo's questioning about the phones didn't fall within the routine-booking exception and thus violated *Miranda*. A mistrial should be granted only "if the defendant's substantial rights are prejudicially affected." *United States v. Newsome*, 475 F.3d 1221, 1227 (11th Cir. 2007). "This occurs when there is a reasonable probability that, but for the remarks, the outcome of the trial would have been different." *Id.* "When a district court gives a curative instruction, the reviewing court will reverse only if the evidence is so highly prejudicial as to be incurable by the trial court's admonition." *United States v. Delgado*, 321 F.3d 1338, 1347 (11th Cir. 2003) (citation modified).

Morgan hasn't shown a violation of his substantial rights. Feo's testimony wasn't so prejudicial as to require stronger medicine than the usual curative instruction. And in any event, plenty of other evidence showed that Morgan owned the LG phone—

including the fact that he had opened accounts on the phone, that the phone had photos of him on it, and that the phone contained texts calling the phone's user by Morgan's first name, "Steven." Given all this evidence, there's no reason to think that "the outcome of the trial would have been different." *Newsome*, 475 F.3d at 1227.

We affirm the district court's decision denying Morgan's motion for a mistrial.

## IV

Morgan also contends that the district court erred in admitting testimony from Agent Gaviria aimed at providing an overview of Morgan's drug-smuggling scheme.

The relevant exchange unfolded as follows: On direct examination, the prosecutor asked Gaviria whether, "based on [her] investigation of this case," she could give "an overview of the international drug trafficking scheme involving the BUMP Stopper cream that [she] recovered." Trial Tr. 77. Gaviria responded:

> [O]ver the course of the entire investigation, I obtained information indicating that the defendant had purchased BUMP Stopper cream from a legitimate seller here in the United States, arranged for these products to be shipped to Saint Martin where a contact known to [her] as Bredda received the shipments, placed cocaine concealed into a false bottom in these containers and shipped the containers back to addresses provided by the defendant.

*Id.* at 78. Gaviria then explained and summarized the various pieces of evidence that she had personally recovered or reviewed.

We generally review a district court's evidentiary rulings for a "clear abuse of discretion." *United States v. Smith*, 459 F.3d 1276, 1295 (11th Cir. 2006). But because Morgan raises this issue for the first time on appeal, plain-error review applies instead. *Id.* at 1296. This requires Morgan to show (1) an error, (2) that is plain, and (3) that affected his substantial rights. *Id.* at 1283. If all three conditions are met, we may exercise our discretion to reverse "only if the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *United States v. Graham*, 981 F.3d 1254, 1260 (11th Cir. 2020) (citation modified). "It is the law of this circuit that, at least where the explicit language of a statute or rule does not specifically resolve an issue, there can be no plain error where there is no precedent from the Supreme Court or this Court directly resolving it." *United States v. Lejarde-Rada*, 319 F.3d 1288, 1291 (11th Cir. 2003).

Federal Rule of Evidence 701 requires lay opinion testimony to be "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Morgan has three Rule 701-based complaints about Gaviria's testimony, which we will address in turn.

First, Morgan asserts that "Gaviria's lay opinion based on the 'entire investigation' was impermissible because [it was] not based

on her rational perception." Br. of Appellant at 55–57. That's incorrect; Gaviria *did* testify based on evidence that she had "obtained" and personally reviewed "over the course of the entire investigation," including text messages from Morgan's LG phone, as well as FedEx, DHL, and Western Union records. That was permissible under Rule 701. *See, e.g.*, *United States v. Jayyousi*, 657 F.3d 1085, 1102 (11th Cir. 2011) ("We have allowed a lay witness to base his opinion testimony on his examination of documents even when the witness was not involved in the activity about which he testified.").

Second, Morgan contends that Gaviria's testimony wasn't helpful to the jury. Citing out-of-circuit decisions, Morgan accuses Agent Gaviria of usurping the jury's function to decide guilt by providing an "overview" of Morgan's scheme. To be sure, we've noted other circuits' concerns about overview testimony. *See, e.g.*, *United States v. Ransfer*, 749 F.3d 914, 927 n.14 (11th Cir. 2014) (acknowledging "that other circuits have raised serious concerns with overview witnesses"); *United States v. Khan*, 794 F.3d 1288, 1300 (11th Cir. 2015). But those generalized concerns don't require reversal even if we spot Morgan the (far from obvious) premise that Gaviria testified about "aspects of the investigation [she] did not participate in." *See Khan*, 794 F.3d at 1300. In short, Morgan can't win on plain-error review because we have no binding caselaw holding that overview testimony violates Rule 701. *See Lejarde-Rada*, 319 F.3d at 1291; *cf. Khan*, 794 F.3d at 1300 (stating in dicta that "prosecutors should not permit investigators to give overview

testimony" but clarifying that overview testimony "is not what happened here" (citation modified)).

Finally, Morgan challenges Gaviria's testimony on the ground that it wasn't helpful to the jury because it was based on inadmissible evidence—"including a coerced statement, illegally obtained evidence, and hearsay." Br. of Appellant at 60. But the record doesn't bear out that assertion. After mentioning "the entire investigation," Gaviria supported her testimony with various tranches of admissible evidence—including FedEx and DHL receipts, as well as messages between Morgan, his brother, and other associates. This evidence shows that there was no Rule 701 error—much less plain error—and also counsels that any error would not have "affect[ed] [Morgan's] substantial rights." *See Smith*, 459 F.3d at 1283 (citation modified).

## V

Morgan also raises two issues concerning one of the government's expert witnesses' testimony.

Here's the background: Before trial, the prosecution filed its notice of intent to use expert testimony as required by Federal Rule of Criminal Procedure 16(a)(1)(G). That filing announced that the government would call HSI Agent Marco Antonio Suarez Jr. as an expert. Aside from listing his basic qualifications, the filing previewed Suarez's opinions, noting that he would "testify about the techniques and practices used by narcotics traffickers like the defendant," including "the manner in which drugs are packaged for trafficking, the manner in which drugs are imported into the

United States and the efforts to conceal their true identity, and the nature of the drug trafficking business." Notice of Intent 2–3, Dkt. No. 32.

After the government submitted its notice but before trial, Rule 16 was amended. The changes replaced Rule 16's previous requirement that the government provide a "written summary" of anticipated expert testimony with a more rigorous demand that it provide "a complete statement of all opinions . . . [and the] bases and reasons for them." Proposed Amends. to Fed. R. Crim. P. 16, 340 F.R.D. 810 (2022); *see also* Fed. R. Crim. P. 16, Advisory Comm. Notes to 2022 Amend. In response to these amendments, the government filed a revised notice—which, in relevant part, added that Suarez would "specify that the jars of 'bump stopper cream' used in this case [we]re consistent with a method of smuggling cocaine into the United States" and opine "that the Western Union payments made in this case [we]re consistent with drug trafficking activity." Rev. Notice of Intent 3–4, Dkt. No. 53.

At trial, after Suarez described his qualifications and experience, the prosecutor asked him what evidence he'd reviewed in forming his opinion. Suarez responded that the government had sent him three reports—one detailing the controlled delivery, one recounting the agents' interview with Morgan, and one summarizing the evidence from the LG phone—as well as one Excel spreadsheet listing roughly 60 Western Union transactions. Because Suarez mentioned the agents' interrogation of Morgan, which the district court had already suppressed, defense counsel moved for a

23-11114                Opinion of the Court                          30

mistrial. The district court denied the motion but offered to give a curative instruction—an offer that the defense rejected on the ground that it "would highlight the problem." Trial Tr. 18.

Suarez then testified about drug pricing, drug-traffickers' methods for distributing proceeds, and common ways of transporting drugs. Two nuggets of testimony are most relevant: Suarez's opinions (1) that the 60-some-odd Western Union transactions he reviewed looked "highly suspicious"; and (2) that the "false bottom[s]" in the jars of shaving gel that the agents discovered were "consistent with international narcotics trafficking." Trial Tr. 33, 39.

## A

Morgan first invokes Federal Rule of Evidence 703 to challenge the district court's refusal to grant a mistrial after Suarez stated that he had reviewed Morgan's suppressed custodial interview in forming his expert opinion.[9] Rule 703 provides that "[a]n expert may base an opinion" on otherwise inadmissible evidence "[i]f experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject." Fed. R. Evid. 703.

Morgan's argument is misguided. The record makes clear that Suarez didn't "base [his] opinion" on the suppressed custodial interview. *See id.* To the contrary, it shows that the basis of

---

[9] We review this decision for an abuse of discretion. *Grzybowicz*, 747 F.3d at 1311.

Suarez's opinions was his extensive experience investigating international drug trafficking. And when Suarez applied his experience to the facts at hand, he did so based on *admissible* evidence. Suarez opined that the Western Union transactions were "highly suspicious" only after reviewing the spreadsheet listing them. And he concluded that Morgan's use of shaving-gel jars was consistent with international drug trafficking only after looking at exhibits depicting the jars that the government had retrieved. The bare fact that Suarez also reviewed Morgan's custodial interview, without more, doesn't make out a Rule 703 violation.

The district court didn't abuse its discretion in declining to grant a mistrial.

**B**

Morgan's other complaints about Suarez's testimony stem from Federal Rule of Criminal Procedure 16. As amended, Rule 16 requires the government to disclose "a complete statement of all opinions that the government will elicit" from its expert, along with "the bases and reasons for them." Fed. R. Crim. P. 16(a)(1)(G)(iii). Because Morgan never objected to Suarez's testimony on Rule 16 grounds below, we review each argument for plain error. *See United States v. Walker*, 73 F.4th 915, 932 (11th Cir. 2023).

Morgan asserts that the government violated Rule 16 in two respects. First, Morgan faults the government's Rule 16 notices for listing only Suarez's "training and experience" as the "bases and reasons" for his opinions, asserting that the notices should also

have disclosed the case-specific reports and spreadsheet that Suarez reviewed. For support, Morgan cites only "the text of Rule 16." Br. of Appellant at 67.

The plain-error standard dooms Morgan's argument. Nothing in Rule 16's text unambiguously requires the detailed disclosure that Morgan posits, and he hasn't pointed us to (nor are we aware of) any binding caselaw obliging experts in Suarez's shoes to disclose case-specific materials. *Cf. United States v. Counts*, 39 F.4th 539, 542–43 (8th Cir. 2022) (holding that the government did not have to disclose that an expert reviewed "case-specific materials" because they "were not a 'basis or reason' for her testimony regarding the general characteristics of sex offenders"). The absence of clear support in Rule 16's plain language or controlling precedent is fatal. *See Lejarde-Rada*, 319 F.3d at 1291.

Second, Morgan insists that the government's Rule 16 notice failed to properly preview two of Suarez's opinions: (1) that the Western Union transactions linked to Morgan were "highly suspicious"; and (2) that the shaving-gel jars were "consistent with international drug trafficking." Morgan's contention fails as a matter of fact—the government did indeed make sufficient disclosures. The amended notice specifically stated that Suarez would opine that the "Western Union payments made in this case are consistent with drug trafficking activity." Rev. Notice 4. It also said that Suarez would "specify that the jars of 'bump stopper cream' used in this case are consistent with a method of smuggling cocaine." *Id.* at 3. That was enough, and Morgan certainly hasn't shown that it was

*plainly* insufficient. *Cf.* Fed. R. Crim. P. 16, Advisory Comm. Notes to 2022 Amend. (explaining that the 2022 amendment "requires a complete statement of all opinions the expert will provide, but does not require a verbatim recitation of the testimony the expert will give at trial").

None of Morgan's objections to Suarez's expert testimony has merit. Accordingly, we affirm the district court's decision to deny his motion for a mistrial.

## VI

Morgan finally seeks reversal based on cumulative error.[10] Under the cumulative-error doctrine, we "will reverse a conviction where an aggregation of non-reversible errors yields a denial of the constitutional right to a fair trial." *United States v. Reeves*, 742 F.3d 487, 505 (11th Cir. 2014). But "no cumulative error exists where a criminal defendant cannot establish that the combined errors affected his substantial rights." *United States v. Wall*, 116 F.4th 1285, 1309 (11th Cir. 2024) (citation modified). And "a defendant's substantial rights are not affected if properly admitted evidence sufficiently established guilt." *Id.* (citation modified).

Morgan's cumulative-error argument fails at the gate because, for reasons explained, he hasn't "established a single error, let alone the aggregation of many errors." *See United States v. Joseph*, 978 F.3d 1251, 1265 (11th Cir. 2020). But even if we were to

---

[10] We review de novo the cumulative effect of multiple evidentiary errors. *United States v. Dohan*, 508 F.3d 989, 993 (11th Cir. 2007).

23-11114                Opinion of the Court                34

grant that the district court erred—though not plainly so—in admitting Agent Gaviria's "overview testimony" and Agent Suarez's expert testimony, *see supra* at 25–33, reversal wouldn't be warranted. Even setting that evidence aside, the government's evidence overwhelmingly established Morgan's guilt. *See United States v. Capers*, 708 F.3d 1286, 1309 (11th Cir. 2013) (deeming the cumulative effect of minor errors "harmless, given the length of the trial, and the strength of the government's case").

### VII

In sum, we hold as follows:

- The district court properly admitted the contents of Morgan's LG phone. The district court did not clearly err in finding that Morgan had abandoned his Fourth Amendment interest in the phone. Nor did the Fifth Amendment forbid the district court from making that finding based on Morgan's statement in the squad car. Although that statement was the product of a *Miranda* violation, it was still voluntary—and its fruits were therefore admissible.

- The district court did not abuse its discretion in declining to grant a mistrial after Agent Feo referred on cross-examination to Morgan's suppressed statement claiming to own both phones.

- The district court did not plainly err in allowing Agent Gaviria to summarize certain aspects of Morgan's drug-smuggling scheme.

- The district court did not abuse its discretion in refusing to grant a mistrial after Agent Suarez gave his expert assessment of the evidence he had reviewed. Nor did it plainly err in allowing Suarez to testify, because Morgan hasn't shown any inadequacies in the government's expert disclosures.

- There's no cumulative error that warrants reversal.

Because Morgan prevails on none of his grounds for appeal, we **AFFIRM** his conviction.

**AFFIRMED.**

23-11114                ROSENBAUM, J., dissenting                1

ROSENBAUM, Circuit Judge, dissenting:

On its journey to securing Steven Morgan's conviction, the government blew past constitutional protection after constitutional protection. Officers repeatedly violated *Miranda*[1] and its progeny's Fifth Amendment guardrails, extracted involuntary statements that the Fifth Amendment does not allow the government to use in a criminal case, and performed a presumptively unconstitutional warrantless search of Morgan's LG cell phone.[2] Morgan had me at the Fifth Amendment.

When law enforcement arrested Morgan, they found two cell phones near him. Officers handcuffed Morgan. But before they read him a *Miranda* warning, they asked him whether the phones were his. Morgan said they were. Then officers promptly placed Morgan in their car, where Agent Mariana Gaviria read him his rights. Morgan immediately invoked his rights to silence and counsel.

But Gaviria didn't respect those rights. Instead, once Morgan had received and invoked his Fifth Amendment right to remain silent, she asked him again whether the phones were his. Morgan tried to avoid answering. He hesitated and said he was "not sure" whether he should respond.

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[2] *See Riley v. California*, 573 U.S. 373, 386 (2014) (holding officers must generally secure a warrant before conducting a search of a cell phone).

23-11114              ROSENBAUM, J., dissenting              2

Of course, the reason someone pleads the Fifth is to avoid becoming "a witness against himself." U.S. CONST. amend. V. Any response from a suspect "can and will be used against the individual in court." *Miranda v. Arizona*, 384 U.S. 436, 469 (1966). Yet after Morgan invoked his Fifth Amendment rights, Gaviria plowed on and implicitly promised Morgan that his answer to her question wouldn't be used against him. In other words, she promised that, by responding, he *wouldn't* become "a witness against himself." U.S. CONST. amend. V. She told Morgan that she "wasn't trying to interrogate him or ask him any questions about the case" but that she "just need[ed] to know if the[] [phones] belonged to him so that [she] could make a note of who the property belonged to in case [she] needed to return it." Only then did Morgan respond and say that "only the iPhone" was his.

Then the government used the statement Morgan made in response to Gaviria's assurances that she "wasn't trying to interrogate him or ask him any questions about the case" to justify its failure to obtain a search warrant for Morgan's phone.[3]

---

[3] The government's unconstitutional behavior did not end there. During the government's pattern and practice of constitutional violations here, Gaviria violated Morgan's Fifth Amendment rights *again*. About 18 months after Morgan's arrest, Gaviria contacted Morgan and arranged a meeting, allegedly to "return some property to him." At that meeting, Morgan again repeatedly invoked his *Miranda* rights. And again, the agents—including Gaviria—repeatedly urged Morgan to talk to them, anyway. Morgan eventually did speak with the agents for about two hours. When he was done, the agents arrested him based on a warrant they had obtained *before* the meeting. Though these

23-11114                    ROSENBAUM, J., dissenting                    3

The resolution of this appeal comes down to whether Gaviria compelled Morgan's statement when she told him she "wasn't trying to interrogate him or ask him any questions about the case" after he had just invoked his right to remain silent and had effectively declined to answer Gaviria's question the first time. But as it turns out, our precedent requires the conclusion that this type of false promise coerced Morgan's statement. *See Bram v. United States*, 168 U.S. 532, 542–43 (1897) (explaining the Fifth Amendment will exclude admissions elicited by implied promises of immunity or leniency). So Morgan's statement wasn't voluntary, and the Fifth Amendment prevents the government from relying on it in Morgan's criminal case.

After all, any lay person would understand Gaviria's statement—which came immediately after she told Morgan that anything he said could be used against him and he had invoked his rights—to mean that the answer to that question wouldn't be used against him. So under our binding precedent, Morgan's answer should not be allowed to be used against Morgan. Any other answer gives officers a green light to compel arrestees' statements without consequence.

---

actions of the agents are not at issue here, along with the agents' other conduct, they show a calculated and complete disrespect for Morgan's constitutional rights. And although we don't reverse convictions to punish officers, the officers' actions are not entitled to a good-faith presumption, given the blatant and repeated trampling of constitutional rights they engaged in here.

23-11114          Rosenbaum, J., dissenting          4

Yet Morgan's compelled statement here forms the sole basis for excusing the government's failure to obtain a warrant to search Morgan's phone. And the government's search of the phone, in turn, provides the evidence necessary to uphold the conviction against Morgan.

I would vacate Morgan's conviction, reverse the district court's order denying Morgan's suppression motion, and remand the case for retrial. After all, the government contravened the Fourth Amendment by searching Morgan's cell phone without a warrant or an applicable exception, and it then compounded that violation relying on Morgan's statement in violation of the Fifth Amendment to defend its Fourth Amendment violation. The Majority Opinion instead absolves the government's harmful, unconstitutional behavior. So I respectfully dissent.

My dissent proceeds in two parts. First, I explain why the officer's implied promise that Morgan's statements would not be used against him compelled those statements under the Fifth Amendment. And second, I show that the record contains no other grounds on which to conclude Morgan abandoned his LG cell phone.

**I.     The government compelled Morgan's statements that he abandoned the LG cell phone through promises that those statements would not be used against him.**

The Fifth Amendment guarantees that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. That Clause offers three core protections.

23-11114          ROSENBAUM, J., dissenting          5

First, it "permits a person to refuse to testify against himself at a criminal trial in which he is a defendant." *Minnesota v. Murphy*, 465 U.S. 420, 426 (1984). Second, it "privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings." *Id.* (quoting *Lefkowitz v. Turley*, 414 U.S. 70, 77 (1973)); *see, e.g.*, *United States v. Burr*, 25 F. Cas. 38, 39–41 (C.C.D. Va. 1807) (No. 14,692e) (Marshall, C.J.). And third, it "bars the introduction against a criminal defendant of out-of-court statements obtained by compulsion." *Vega v. Tekoh*, 597 U.S. 134, 141 (2022).

This dispute concerns the last protection. Morgan's statements disclaiming ownership of the LG cell phone are inadmissible for any purpose if (1) the government "compelled" them and (2) the district court's suppression hearing and ultimate suppression order occurred "in a[] criminal case." U.S. CONST. amend. V. The Majority Opinion doesn't dispute the second requirement,[4] but it

---

[4] Indeed, the Fifth Amendment's "criminal case" requirement includes pretrial proceedings, like suppression hearings. The original public meaning of "case" broadly encompassed "proceeding[s] in court." *Blyew v. United States*, 80 U.S. 581, 595 (1871) (defining "case"). In fact, the Supreme Court has held that grand-jury proceedings, which generally occur before suppression hearings on a prosecution's timeline, are part of a criminal case. *See Counselman v. Hitchcock*, 142 U.S. 547, 562–63 (1892), *overruled on other grounds by Kastigar v. United States*, 406 U.S. 441 (1972). Plus, the Sixth Amendment, which applies in the narrower context of a "criminal prosecution," *see id.*, applies to suppression hearings, *see Henderson v. Frank*, 155 F.3d 159, 164–67 (3d Cir. 1998); *cf. United States v. Wilson*, 979 F.3d 889, 912–14 (11th Cir. 2020). So the Fifth

23-11114              ROSENBAUM, J., dissenting                    6

disagrees with me on the first.  So I focus on the first: whether Morgan testified involuntarily.

I begin by observing that the answer to this question is a "legal [one], not . . . [a] factual [one]."  *Taylor v. Singletary*, 148 F.3d 1276, 1282–83 (11th Cir. 1998); *see Medina v. Singletary*, 59 F.3d 1095, 1101 (11th Cir. 1995) (citing *Arizona v. Fulminante*, 499 U.S. 279, 287 (1991)).  So the district court's determination that Morgan voluntarily said that the LG cell phone was not his "is not now entitled to a presumption of correctness."  *Taylor*, 148 F.3d at 1283.

Rather, we must decide, as a matter of law, whether the totality of the circumstances shows that the government compelled Morgan's statement.   *See Fulminante*, 499 U.S. at 287 (explaining "the ultimate issue of voluntariness is a legal question requiring independent federal determination" (cleaned up)).  And based on the totality of the circumstances, Agent Gaviria's statement that she "wasn't trying to interrogate [Morgan] or ask him any questions about the case," Tr. of Supp. Hearing 14, "implied [the] promise[]," *Bram*, 168 U.S. at 542–43 (citation omitted), that the government would not use against Morgan his answer to her question.

The rule that makes statements inadmissible if the government obtains them with promises of leniency or favor dates to the common law.  English courts recognized that confessions "forced

---

Amendment's more expansive language—"criminal case"—covers suppression hearings all the same.  *See, e.g.*, *Best v. City of Portland*, 554 F.3d 698, 702–03 (7th Cir. 2009); *United States v. Chavez*, 985 F.3d 1234, 1245–46 (10th Cir. 2021).

23-11114                 ROSENBAUM, J., dissenting                          7

from the mind by the flattery of hope" are inherently untrustworthy, worth "no credit," and ought to be "rejected." *King v. Warickshall* (1783) 168 Eng. Rep. 234, 235; 1 Leach 262, 263–264; *accord King v. Rudd* (1783) 168 Eng. Rep. 160, 161, 164; 1 Leach 115, 117–118, 122–123 (Lord Mansfield, C.J.) (explaining courts exclude testimony obtained by promises of favor); *Queen v. Garner* (1848) 169 Eng. Rep. 267, 267; 1 Den. 329, 329–31 (excluding statements given after a medical man proffered "that it would be better for her to speak the truth"); *Queen v. Baldry* (1852) 169 Eng. Rep. 568, 575; 2 Den. 430, 446 (explaining testimony procured by "any worldly advantage held out" is to be excluded, not necessarily because "the law supposes that the statement will be false, but" because "the prisoner has made the confession under a bias, and that, therefore, it would be better not to submit it to the jury"); *see also* 1 LEONARD MACNALLY, THE RULES OF EVIDENCE ON PLEAS OF THE CROWN 47–49 (London, J. Butterworth & Dublin, J. Cooke 1802) (offering an overview of this legal rule).

Over time, we've "recognized two constitutional" provisions that have adopted this common-law rule: "the Fifth Amendment right against self-incrimination and the Due Process Clause of the Fourteenth Amendment." *Dickerson v. United States*, 530 U.S. 428, 433 (2000) (first citing *Bram*, 168 U.S. at 542; and then citing *Brown v. Mississippi*, 297 U.S. 278 (1936)); *cf.* Orin S. Kerr, *Decryption Originalism: The Lessons of* Burr, 134 HARV. L. REV. 905, 908–13, 925–26 (2021) (discussing the influence of another section of MacNally's treatise on Chief Justice Marshall and prominent attorneys in early Fifth Amendment litigation).

The lines of cases on these principles have refined the common-law rule "into an inquiry that examines 'whether a defendant's will was overborne' by the circumstances surrounding the giving of a confession," including "the characteristics of the accused and the details of the interrogation." *Dickerson*, 530 U.S. at 434 (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)). But consistent with the common-law rule, we have explained that a promise of leniency that undermines a person's legal rights "may be the most significant factor in assessing the voluntariness of an accused's confession." *United States v. Lall*, 607 F.3d 1277, 1286 (11th Cir. 2010) (quoting *United States v. Walton*, 10 F.3d 1024, 1030 (3d Cir. 1993)).

*Lall* shows that we've applied this principle to conclude that statements resulting from an officer's negation of a person's Fifth Amendment rights are not "voluntary," so the government may not use them against the defendant for any purpose in a criminal case.

In *Lall*, police officers went to the defendant's house to investigate a robbery of his home that others had committed. *Id.* at 1281. But during the investigation, they learned that Lall was involved with credit-card fraud and identity theft. *Id.* So they gave Lall *Miranda* warnings outside his house. *Id.* Then they took him up to his bedroom, purportedly to further investigate the home robbery. *Id.* The officers told Lall that they wouldn't use any information he gave them to prosecute him. *Id.* With that assurance, Lall showed the officers the equipment he used to commit identity

theft and explained how each device worked. *Id.* Based on Lall's statements, the officers seized "skimmers" and an "encoder" that Lall used in his criminal activity. *Id.* And while the officer promised he wouldn't use the items to prosecute Lall, he almost immediately turned them over to the Secret Service.

Later, a police officer called Lall and instructed him to go to the police station. *Id.* The officer again said that he "wasn't going to be charging [Lall] with any of this" and Lall would not need a lawyer. *Id.* Still, when Lall arrived, the officer read him his *Miranda* warnings. *Id.* at 1281–82. Lall then further implicated himself in the scheme he had disclosed earlier to the officers. *Id.* Later, the Secret Service arrested Lall and charged him with the federal crimes of conspiracy to commit credit-card fraud, possession of device-making equipment with intent to defraud, and aggravated identity theft. *Id.* at 1282.

Lall moved to suppress his initial statements to the officer and the physical evidence the officer collected from his bedroom. *Id.* The district court denied Lall's motion, and a jury convicted Lall. *Id.*

On appeal, we determined that Lall's statements and the resulting evidence had to be suppressed because the officer had coerced Lall into confessing when he promised Lall he wouldn't charge him. *See id.* at 1282–93. We explained, "through promises of non-prosecution, 'the government has made it impossible for the defendant to make a *rational* choice as to whether to confess—has made it in other words impossible for him to weigh the pros

23-11114                    ROSENBAUM, J., dissenting                    10

and cons of confessing and go with the balance as it appears at the time.'" *Id.* at 1286 (quoting *United States v. Rutledge*, 900 F.2d 1127, 1129 (7th Cir. 1990)).  Indeed, we reasoned, "if the government feeds the defendant false information that seriously distorts his choice . . . then the confession must go out." *Id.* (alterations in original) (quoting *Rutledge*, 900 F.2d at 1129).

In particular, we found it "inconceivable that Lall, an uncounseled twenty-year-old, understood at the time that a promise by [the police officer] that he was not going to pursue any charges did not preclude the use of the confession in a federal prosecution." *Id.* at 1287.  But we didn't stop there.  Indeed, we said, it was "utterly unreasonable to expect *any* uncounseled layperson, especially someone in Lall's position, to so parse [the police officer's] words." *Id.* (emphasis added).  Rather, we continued, "the only plausible interpretation of [the officer's] representations, semantic technicalities aside, was that the information Lall provided would not be used against him by [the officer] or anyone else." *Id.*  For this reason, we concluded that "[the officer's] statements were sufficient to render Lall's confession involuntary and to undermine completely the prophylactic effect of the *Miranda* warnings [the officer] previously administered." *Id.*

We also considered the admissibility of the physical evidence the officers obtained as a result of Lall's statements. *Id.* at 1291.  As we explained, "evidence derived from an *involuntary* confession" is subject to the exclusionary rule. *Id.* (emphasis added).  Noting that Lall's confession was "involuntary," we held that "conclusion

compels the suppression of any physical evidence derived from it." *Id.* And given that the officer would not have been able to obtain the physical evidence without Lall's admission because the officer didn't know what it was, we determined that the physical evidence also had to be excluded. *Id.* at 1291–92.

Morgan's case is not meaningfully different. Almost immediately after Gaviria told Morgan anything he said could be used against him, she asked him about the phones. Morgan declined to answer. So Gaviria told him she "wasn't trying to interrogate [Morgan] or ask him any questions about the case." And only then did Morgan answer her question.

To be sure, Gaviria did not use the words, "your answers will not be used against you." But any layperson would understand that from her statement, as she gave it immediately after she told Morgan that he didn't have to speak with her and anything he said could be used against him, and he had invoked his right to remain silent. As we explained in *Lall*, "the only plausible interpretation of [Gaviria's] representations, semantic technicalities aside, was that the information [Morgan] provided would not be used against him by [Gaviria] or anyone else." *Id.* at 1287. So under the totality of the circumstances, "[Gaviria's] statements were sufficient to render Lall's [statement] involuntary and to undermine completely the prophylactic effect of the *Miranda* warnings [Gaviria] previously administered." *Id.*

The Majority Opinion reaches the opposite answer only because it concludes that Gaviria's statement that she "wasn't trying

23-11114          ROSENBAUM, J., dissenting          12

to interrogate [Morgan] or ask him any questions about the case" was not an "affirmative '[p]olice misrepresentation[] of law.'" Maj. Op. at 20–21 (quotation omitted). Yet as the Majority Opinion explains, "[i]n each case [where we've held an officer's lie to a defendant makes the defendant's statement involuntary], the officers directly negated one of *Miranda*'s core protections—namely, [as relevant here,] '. . . that anything [the suspect] says can be used against him in a court of law . . . .'" *Id.*

And that's precisely what happened here. Gaviria's promise that she "wasn't trying to interrogate [Morgan] or ask him any questions about the case" negated one of the Fifth Amendment's core protections: that Morgan may remain silent to avoid becoming "a witness against himself," U.S. CONST. amend. V; *see Vega*, 597 U.S. at 141 (explaining the Fifth Amendment allows individuals to refuse to answer questions). Her promise "deceived [him] about . . . 'the consequences of abandoning'" his Fifth Amendment right to remain silent. *United States v. Farley*, 607 F.3d 1294, 1330 (11th Cir. 2010) (citation omitted). As I've explained, any layperson hearing Gaviria's statement immediately after invoking his Fifth Amendment rights and declining to answer questions would think no negative consequences would come from responding to Gaviria's question about the phone.

And for that reason, Gaviria's negation of the Fifth Amendment—particularly in the context here, where Morgan had told another officer that both phones were his, Gaviria had just told Morgan his Fifth Amendment rights, and he had then refused to answer

her question—made Morgan's statement involuntary.  *See United States v. Beale*, 921 F.2d 1412, 1435 (11th Cir. 1991) (holding defendant's waiver of *Miranda* was involuntary when he gave statements in response to the agent's false representation that "signing the [*Miranda*] waiver would not hurt him"); *Hart v. Att'y Gen. of the State of Fla.*, 323 F.3d 884, 894–85 (11th Cir. 2003) (holding defendant's waiver of *Miranda* was involuntary when he gave it in response to the agent's false statement that "honesty wouldn't hurt him").

Yet the Majority Opinion insists that Gaviria's lie here—which it correctly concludes could not have been for administrative purposes, *see* Maj. Op. at 12—did not go to the Fifth Amendment's core protections, *see id.* at 21–22.  The Majority Opinion doesn't explain why or how that is so, though.  It simply concludes without analysis that Gaviria's lie that she "wasn't trying to interrogate [Morgan] or ask him any questions about the case" didn't "deceive[] [him] about . . . the consequences of abandoning" his Fifth Amendment right to remain silent.  *Id.* at 21 (internal quotation marks omitted) (quoting *Farley*, 607 F.3d at 1330).

Compounding that error, the Majority Opinion then lumps Gaviria's false assurance to Morgan in with officers' deceptive practices that *do not* go to the heart of the Fifth Amendment.  So the Majority Opinion analogizes to *Farley*.  *See id.*  But there, the officer's deception fell into a completely different category from Gaviria's lie here.

In *Farley*, the agents made the defendant believe they were questioning him about terrorism when they instead were

23-11114          ROSENBAUM, J., dissenting          14

investigating him for sex crimes. 607 F.3d at 1326, 1327–30. At no point did the *Farley* agents deceive the defendant into thinking answering their questions wouldn't be used against him. Nor did they negate the Fifth Amendment's protections in any way. Indeed, we noted, there was "no evidence" the agents "made any promise that questioning would be limited to" the subject of terrorism, and the officers did not assure Farley "that statements relating to other crimes would not be used against him." *Id.* at 1329. "To the contrary, the agents warned Farley, as required by *Miranda*, that 'anything' he said could be used against him in court." *Id.* at 1330. And nothing in the record undermined that unyielding warning about the consequences of waiving his Fifth Amendment right to remain silent. *See id.* ("Not just some things, but anything.").

That's not the case here, though. As in *Lall*, only one "plausible interpretation of [Gaviria's] representations" exists: that Morgan's answer to her question about the phones "would not be used against him by [Gaviria] or anyone else." *See* 607 F.3d at 1287.

But the government did use Morgan's statement about the phones against him; they used it to justify its warrantless search of Morgan's phone, even though he had told another agent earlier that the phone was his. Because Gaviria's false promise deprived Morgan of knowledge of the consequences of his answer to Gaviria's question about the phones, our precedent requires the conclusion that Morgan's response was involuntary.

And because Morgan's response was involuntary, *Patane*—which the Majority Opinion relies on, *see* Maj. Op. at 13–16 (citing

*United States v. Patane*, 542 U.S. 636 (2004) (plurality opinion))—is irrelevant here.  As the Majority Opinion recognizes, *Patane*'s plurality held that "a police officer's 'failure to give a suspect the [*Miranda*] warnings . . . [does not] require[] suppression of the physical fruits of the suspect's unwarned but *voluntary* statements.'"  *Id.* at 13 (alterations in original) (emphasis added) (quoting *Patane*, 542 U.S. at 633–34).  In other words, *Patane* doesn't govern cases like this one, where *involuntary* statements are at issue.

Instead, *Kastigar* governs, meaning we must exclude from the criminal case involuntary statements as well as the physical fruits obtained because of those statements.  *See Kastigar v. United States*, 406 U.S. 441, 453 (1972) (explaining the Fifth Amendment prevents the "use and derivative use" of compelled statements); *United States v. Schmidgall*, 25 F.3d 1523, 1528 (11th Cir. 1994) (explaining the Fifth Amendment privilege prevents the government from using "any of the evidence" that is "in any way derived" from involuntary testimony); *Lall*, 607 F.3d at 1291 ("[W]e have found Lall's confession involuntary—a conclusion that compels the suppression of any physical evidence derived from it.").

To all this, the Majority Opinion invokes its right to remain silent.  Rather than respond to the points I raise, the Majority Opinion waves them off, implying that *Beale*, *Hart*, and *Lall* were all wrongly decided in the first place.  Maj. Op. at 22 n.7.  Those cases were wrong and "odd," the Majority Opinion suggests, because they allegedly transgress *Patane* by "conflat[ing] *Miranda*'s court-created formulation with the Fifth Amendment proper."  *Id.*  And

because those cases are supposedly wrong, the Majority Opinion concludes, there's no need to apply (or, as the Majority Opinion characterizes it, "extend") them here. *See id.* (emphasis omitted).

Of course, our prior-panel-precedent rule has no exception even if the panel is sure the precedent is wrong. *In re Lambrix*, 776 F.3d 789, 794 (11th Cir. 2015). Indeed, "a healthy respect for the decisions of [our] colleagues—both past and present—counsels a fairly rigorous application of the prior-panel-precedent rule." *Kondrat'yev v. City of Pensacola*, 949 F.3d 1319, 1335 n.1 (11th Cir. 2020) (Newsom, J., concurring). So the Majority Opinion's disagreement with *Lall* does not excuse us from our duty to apply *Lall*. As we've said, "[r]espect for our precedent requires us not to adopt" a new legal rule "that would effectively neuter our previous holding." *CSX Corp. v. United States*, 18 F.4th 672, 682 (11th Cir. 2021). The Majority Opinion can't cabin *Lall* on the premise that it was wrong in the first place.

And in any case, the *Lall* rule—that confessions the government obtains through false promises of the Fifth Amendment consequences they will bring—is not "odd," but, rather, "o[l]d." It dates to the Founding and English common law. *See Dickerson*, 530 U.S. at 433 (explaining "English courts excluded confessions obtained by . . . promises"). Nor, with the greatest of respect for my colleagues in the Majority, is that the only thing the Majority Opinion gets wrong about *Lall*; the Majority Opinion errs in two other ways when it comes to *Lall*.

23-11114               ROSENBAUM, J., dissenting                17

First, *Lall* doesn't rely on the fact that an officer "misrepresent[ed] *Miranda*[]." *See* Maj. Op. at 22 n.7. Rather, it relies on the fact that the officer procured a confession by false promises about the consequences of waiving Fifth Amendment rights. *See Lall*, 607 F.3d at 1285. Even if the officers in *Lall* or in Morgan's case had not issued a *Miranda* warning, they still would have impermissibly compelled testimony by making the—patently incorrect—"implied promise[]," *Bram*, 168 U.S. at 542–43 (citation omitted), that the defendants' statements wouldn't be used against them. That the officers made those promises after they issued *Miranda* warnings just makes the "totality of the circumstances" inquiry easier. *See Dickerson*, 530 U.S. at 433–34. In short, the Majority Opinion can't take refuge behind *Patane*—and its limitations on *Miranda*—because *Miranda* isn't at issue here; the Fifth Amendment is. *See* U.S. CONST. amend. V (protecting any person from becoming "a witness against himself"); *Walton*, 10 F.3d at 1028 ("This is not a *Miranda* case."); *see also Lall*, 607 F.3d at 1286 (finding *Walton* "particularly instructive").

Second, the Majority Opinion incorrectly asserts that adhering to *Lall* here would somehow "extend" its allegedly "odd" result. Maj. Op. at 22 n.7 (emphasis omitted). *Lall*'s core is that "a promise" that an accused's statement will not be used against her "may be the most significant factor in assessing the voluntariness of an accused's confession in light of the totality of the circumstances." 607 F.3d at 1286 (quoting *Walton*, 10 F.3d at 1030). We wouldn't "extend" that rule by concluding Agent Gaviria compelled Morgan to waive his Fifth Amendment right to remain silent because she

promised that his response wouldn't be used against him. We'd just apply *Lall*'s holding in a straightforward manner. That is, applying *Lall* to Morgan's case in no way "extends" it.

In sum, the government couldn't have relied on Morgan's statements in the squad car disclaiming ownership of the LG cell phone. And as I explain in the next section, the government has no other viable grounds for avoiding the Fourth Amendment's warrant requirement.

**II.    The government could have introduced the evidence obtained from the LG cell phone only through Morgan's involuntary statement that he abandoned it.**

As a fallback plan, the government contends that Morgan circumstantially abandoned the LG cell phone by not attempting to recover it from police custody between the phone's November 2020 seizure and Morgan's July 2022 arrest. That argument necessarily fails, though.

The government invokes *Sparks* and *Green* to assert that Morgan abandoned his phone by failing to try to obtain it from police custody. *See, e.g.*, *United States v. Green*, 981 F.3d 945, 956 (11th Cir. 2020); *United States v. Sparks*, 806 F.3d 1323, 1343–47 (11th Cir. 2015), *overruled in part on other grounds by United States v. Ross*, 963 F.3d 1056 (11th Cir. 2020) (en banc). But those cases involved materially distinguishable facts.

I start with *Sparks*. For several reasons, there, we held that the defendants abandoned a cell phone after they lost the phone in a Wal-Mart store and left it with the store employee who recovered

23-11114              ROSENBAUM, J., dissenting                    19

it. 806 F.3d at 1330. First, the defendants contacted the employee to arrange to retrieve the phone, showing a private party (not the government) that the phone was theirs and they wanted it back. *Id.* at 1343. Second, when the employee failed to meet the defendants as they arranged, the defendants never tried to get the phone back, even though they knew who the employee was and where she worked. *Id.* Third, after deciding not to continue their efforts to retrieve the phone, the defendants filed an insurance claim for it— again, even though they knew the third party that had the phone and how to obtain it. *Id.* Fourth, rather than pursuing their phone, the defendants bought a replacement phone. *Id.* We explained that "the only reasonable conclusion from this record [was] that [the defendants] had no intention to do anything further to recover" the phone. *Id.* at 1344.

*Sparks* is a far cry from Morgan's case. After the defendants admitted the phone was theirs and arranged to retrieve it, the *Sparks* defendants chose not to follow up when the employee failed to meet them. They also filed an insurance claim, and they replaced the phone, signifying that they intended not to keep seeking to collect the phone they left with the employee. By contrast, here, aside from Morgan's compelled testimony, he engaged in no affirmative acts of abandonment. And Morgan didn't have a reasonable opportunity to recover the phone; the federal agents never released it to Morgan after seizing it from him. *Contra id.* at 1344 (explaining the defendants "could have instead chosen to retrieve the phone with minimal, or at most, reasonable effort"). So *Sparks*

doesn't suggest that Morgan abandoned his phone merely by failing to seek to recover it from police custody.

The government fares no better under *Green*. There, the police lawfully seized a cell phone from the defendant "incident to an arrest for driving with a suspended license." 981 F.3d at 956. About two days later, though, the police released the phone. *Id.* Yet the defendant left the phone in police custody for the next four years, allowing the government to use it in the defendant's eventual prosecution for drug-trafficking and related charges. *Id.* at 950, 956. And no evidence in the record suggested that the defendant "did or said anything over the course of four years to maintain his interest in the phone." *Id.* at 956. So we concluded the defendant "'voluntarily discarded, left behind, or otherwise relinquished his interest' in the phone." *Id.* (quoting *Sparks*, 806 F.3d at 1342).

As in *Sparks*, in *Green*, the defendant had an immediate opportunity to recover the phone; law enforcement authorized the release of the phone to the defendant 48 hours after his arrest. Yet the defendant chose to leave the phone with law enforcement for four years. Plus, the police seized the phone incident to an arrest for driving with a suspended license, not an offense even remotely related to the drug-trafficking prosecution in which the government introduced the phone four years later. By contrast, here, the government held the phone in its custody for about a year and a half without offering to return it to Morgan. And the government seized and held the phone as part of an active investigation into Morgan. So here, unlike in *Sparks* or *Green*, the district court could

23-11114              Rosenbaum, J., dissenting                21

not find that "reasonable efforts were available" to Morgan "to recover" the phone. *Sparks*, 806 F.3d at 1347.

Also, stretching *Sparks* and *Green* to cover the very different facts here—a mere failure to request that the police return a phone it seized—would put every defendant to a constitutional dilemma. On the one hand, to maintain a property interest in his phone and contest a warrantless search under the Fourth Amendment, Morgan would have to waive his Fifth Amendment right against self-incrimination by engaging in the equivalent of an "act of production" and admitting ownership of the phone and the information it contains. *See United States v. Hubbell*, 530 U.S. 27, 36–37 (2000) (holding the act of production is testimonial under the Fifth Amendment because it may "implicitly communicate" certain facts, such as the existence, ownership, and authenticity of documents). On the other hand, by exercising his Fifth Amendment right to remain silent, Morgan would waive his Fourth Amendment right to a search by warrant. Such a "classic penalty situation" is untenable. *McKathan v. United States*, 969 F.3d 1213, 1217 (11th Cir. 2020) (quoting *Murphy*, 465 U.S. at 435).

*Simmons v. United States* compels this conclusion. 390 U.S. 377 (1968). There, a criminal defendant sought to suppress evidence from a suitcase the government seized without a warrant from the defendant's coconspirator's mother's basement. *See id.* at 380–81. At the suppression hearing, to establish a Fourth Amendment interest in the suitcase, the defendant testified that it looked like it was his. *Id.* at 381. After the district court denied the

23-11114                ROSENBAUM, J., dissenting                22

suppression motion, the government used the defendant's testimony at trial to show that the defendant owned the suitcase. *Id.* The Supreme Court reversed the conviction because it relied on testimony that the government used in violation of the Fifth Amendment. *See id.* at 393.

The Court explained that allowing the government to use a defendant's suppression-hearing testimony to convict him at trial "imposes a condition of a kind to which" it "has always been peculiarly sensitive." *Id.* at 393. If the defendant invoked his Fifth Amendment right to remain silent, the Court reasoned, he would have sacrificed a different right "afforded by another provision of the Bill of Rights," creating an "undeniable tension" between the two. *Id.* at 394. Indeed, the Court added, the district court forced the defendant either to "give up what he believed, with advice of counsel, to be a valid Fourth Amendment claim or, in legal effect, to waive his Fifth Amendment privilege against self-incrimination." *Id.* The Court held that legal Catch-22—that "one constitutional right should have to be surrendered in order to assert another"— "intolerable." *Id.* So it concluded the defendant's suppression-hearing testimony could not be used against him at trial and reversed the conviction. *Id.*

Adopting the government's argument that Morgan abandoned his phone merely by failing to seek it from law enforcement while officers held the phone as evidence would put Morgan in a situation no different from that of the *Simmons* defendant. He would either have to sacrifice the Fourth Amendment's warrant

23-11114             ROSENBAUM, J., dissenting                 23

requirement—and the exclusion remedy the Supreme Court has attached to violations of it, *see id.* at 389—by enabling a court to conclude he abandoned property in the government's possession or, "in legal effect," "waive his Fifth Amendment privilege against self-incrimination" by attempting to recover his property and showing an ownership interest in it, *id.* at 394. So *Simmons* prevents us from adopting the government's attempt to expand *Sparks*, *Green*, and our abandonment precedent.

In short, the government's fallback argument for concluding that Morgan abandoned his cell phone fails, too. It has no excuse for failing to obtain a warrant to search the LG cell phone. And we should have excluded that evidence. *See Elkins v. United States*, 364 U.S. 206, 209–10 (1960).

⋆    ⋆    ⋆

The government should not have introduced at trial evidence obtained from and because of its warrantless search of the LG cell phone. We can't conclude Morgan abandoned the cell phone just because he left it in police custody. Nor can we rely on Morgan's involuntary statement that the LG cell phone was not his. Morgan offered that confession in custody after Agent Gaviria implicitly assured him that his statements about who owned the cell phones would not be used against him. Under our binding precedent, Agent Gaviria's lie that negated Morgan's Fifth Amendment protections made Morgan's statement involuntary under the totality of the circumstances. So I would vacate Morgan's conviction,

23-11114                ROSENBAUM, J., dissenting                24

reverse the district court's order denying his motion to suppress, and remand the case for a new trial.